## Secretary, Vermont Agency of Natural Resources v. Handy Family Enterprises and Taft Corners Associates, Inc.

[660 A.2d 309]

No. 93-367

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed April 14, 1995

*Christine Melicharek*, Waterbury, for Plaintiff-Appellant.

*Carl H. Lisman* of *Lisman & Lisman, P.C.*, Burlington, for Defendant-Appellee Handy Family Enterprises.

*Robert F. O'Neill* of *Gravel and Shea*, Burlington, for Defendant-Appellee Taft Corners Assocs.

**Dooley, J.** The Secretary of the Agency of Natural Resources (Secretary) appeals a decision of the Environmental Law Division (ELD) assessing penalties against Handy Family Enterprises (HFE) and Taft Corners Associates, Inc. (TCA) for violations of their Act 250 land use permits. The Secretary challenges the ELD's calculation of penalties, its conclusion that the permit violations caused only slight environmental harm, and its finding that the violations did not predate May 17, 1991. HFE cross-appeals, claiming that the ELD incorrectly imposed penalties for HFE's use of temporary banners and its failure to remove light fixtures prohibited by the permits. HFE also claims the penalty amount is unsupported by the record. TCA, also a cross-appellant, challenges the ELD's calculation and imposition of penalties against TCA and HFE jointly, as though they were a single entity, rather than considering TCA separately. We reverse the ELD's determination imposing penalties for the placement of banners prior to October 8, 1991, reverse and remand the calculation of remaining penalties, and affirm the conclusion that the violations caused only slight environmental harm.

TCA owns a thirty-seven lot industrial park located in Williston. HFE is under affiliated ownership with Seven Maples Corporation, which owns and operates the Ponderosa Restaurant on Lot 30 of the TCA industrial park. Under the operating arrangement between HFE and Seven Maples, permits for Lot 30 are in the name of HFE. On April 27, 1990, HFE and TCA applied for an Act 250 land use permit, 10 V.S.A. § 6081, to allow the construction and operation of the restaurant. Included in the permit application was a plan to install signs for the restaurant. In August 1990, the District 4 Commission issued HFE and TCA Land Use Permit 4C0696-9 (the 9 permit) approving the construction and operation of the restaurant, but it did not approve the parties' proposal for four internally illuminated signs previously sanctioned by the Williston Planning Commission. Condition 23 of the 9 permit required the applicants to obtain written approval from the District 4 Commission for an alternative sign plan prior to the installation of any exterior signs. The parties did not appeal the 9 permit.

HFE and TCA thereafter discussed the restaurant signs with the Williston Planning Commission. The Planning Commission wrote the District 4 Commission, stating that it favored internally illuminated signs over other types of signs. On December 27, 1990, HFE and TCA applied to the District Commission for a permit amendment to allow four internally illuminated signs.

On February 4, 1991, the District 4 Commission issued an amended permit (the 9A permit) approving two internally illuminated awning signs and a freestanding parking lot directional sign. Condition 7 of the 9A permit stated "the installation of signs are limited to those approved," and condition 8 stated "any other signage or change to the signage herein approved is strictly prohibited" without prior written approval from the District 4 Commission.

HFE placed two banners (banners 1 and 2) on the restaurant's exterior on February 27, 1991. Both banners were two feet by ten feet in size, and read "Ponderosa Steak House Now Open." Banner 1 remained on the restaurant for eleven months.

HFE placed two additional banners (banners 3 and 4) on the building on May 1, 1991. Banner 3 was two feet by twenty feet, with lettering stating "Sirloin Tips Special $5.99" and "U.S.D.A. Choice." Banner 3 was displayed on the building on May 15 and 20, June 17 and July 5, 1991. Banner 4, which remained on the building for twenty days, was two feet by thirty feet, and advertised "3 Super Sandwich Specials $3.99, includes fries and beverage - lunch only."

On May 15, 1991, the District Coordinator informed HFE and TCA that the Commission believed the banners violated the 9A permit. HFE and TCA immediately requested written approval from the Commission for the banners. The Commission denied the request on May 16, informing HFE and TCA that they should submit their request in the form of a permit amendment application. Neither HFE nor TCA submitted an amendment application.

On May 20, 1991, the District Coordinator issued a Notice of Alleged Violation to HFE and TCA. The notice stated that the restaurant's banners violated both the 9 and the 9A permits. Nevertheless, HFE installed banner 5 on May 25, 1991. Banner 5 was similar in size to banner 3 and stated, "New Charbroiled Chicken Dinners $6.99." Banner 5 remained on the building for approximately forty days.

In July 1991, HFE and TCA filed a permit amendment application requesting approval for an internally illuminated, building-mounted sign. On October 8, 1991, the District 4 Commission issued a permit approving the installation of an internally illuminated, building-mounted sign (the 9B permit), and requiring HFE to remove interior light fixtures that hung above the dining tables immediately adjacent to the first-floor windows. This permit prohibited the installation of any "temporary signs, banners, posters, or flags . . . without the prior written approval of the District Commission"; HFE did not remove the banners, however, nor did TCA take any action to have the banners removed, following the issuance of the 9B permit.

On December 10, 1991, the installation of the internally illuminated, building-mounted sign was completed. On February 24, 1992, HFE placed banner 6 on the exterior of the building. Banner 6 was similar in size and location to banner 5 and stated, "New! New York Strip, Porterhouse, Filet Mignon — So good they're guaranteed!" Banner 6 remained on the building until March 3, 1992.

In March 1992, the Secretary issued an administrative order pursuant to 10 V.S.A. § 8008, requiring the parties to remove all signs not allowed by the 9A permit and assessing a penalty of $25,000. HFE and TCA requested a hearing before the ELD, as authorized by 10 V.S.A. § 8012(a).

Following a hearing, the ELD issued findings, conclusions and an order on June 13, 1993. In considering the banners, it decided to look at three separate periods. During the last period, between the time the 9B permit was issued (October 9, 1991) and the time the last banner was removed (March 3, 1992), the ELD concluded there was

a clear violation of condition 8 of the 9B permit. As to the second period, from the date the District Commission denied permission to put up the banners (May 17, 1991) to the date of issuance of the 9B permit (October 9, 1991), the ELD concluded HFE and TCA violated the permit conditions because they kept the banners up knowing of the District Commission's permit interpretation. As to the first period, from the date the first banner was placed on the building (February 27, 1991) to the date of the District Commission denial of permission to put up the banners (May 17, 1991), the ELD found no permit condition violation because the permits "did not specifically address temporary banners" and other businesses covered by TCA's umbrella permit were using "temporary banners and flags without apparent challenge." The ELD imposed penalties against HFE and TCA, jointly and severally, for the second and third periods, as well as for failure to remove the interior light fixtures as required by the 9B permit, in the amount of $14,463. This appeal followed.

## I.

All parties contest the ELD's decision to treat the first and second periods differently. The Secretary argues that notification by the District Coordinator does not trigger a violation of the permit and that, if there was a violation during the second period, there also had to be a violation during the first period. HFE and TCA agree with the first part of the Secretary's argument but claim that if there was no violation for the first period, there could not have been one for the second period.

■ Before we address the specific arguments, we must first consider the principles controlling our construction of permit conditions and the standard of review. We see no reason to depart from normal statutory construction techniques in interpreting permit conditions. We strive to implement the intent of the draftspersons. See *Conn v. Middlebury Union High School*, 162 Vt. 498, 501, 648 A.2d 1385, 1387 (1994). Ordinarily, we rely on the plain meaning of words because we presume they show the underlying intent. See *id.*

■ Some principles are specifically related to the task before us. We have held with respect to Act 250 that "in construing land use regulations any uncertainty must be decided in favor of the property owner." *In re Vitale*, 151 Vt. 580, 584, 563 A.2d 613, 616 (1989); see also *Committee to Save the Bishop's House, Inc. v. Medical Center Hosp. of Vt.*, 137 Vt. 142, 152, 400 A.2d 1015, 1020 (1979). These

holdings are based on our zoning decisions that have emphasized that ambiguity must be resolved for the property owner. See *Murphy Motor Sales, Inc. v. First Nat'l Bank*, 122 Vt. 121, 123-24, 165 A.2d 341, 342-43 (1960). We have also held that zoning permit conditions "must be expressed with sufficient clarity to give notice of the limitations on the use of the land." *In re Farrell & Desautels, Inc.*, 135 Vt. 614, 617, 383 A.2d 619, 621 (1978); see also *In re Kostenblatt*, 161 Vt. 292, 299, 640 A.2d 39, 44 (1994) (reaffirming *In re Farrell & Desautels, Inc.*); *In re Robinson*, 156 Vt. 199, 202, 591 A.2d 61, 62 (1991) (conditions valid if "unqualified and definite"). This limitation should apply to Act 250 conditions. See 10 V.S.A. § 6086(c) (Act 250 permit may contain conditions "within the proper exercise of the police power").

These limitations on our interpretation of Act 250 and permit requirements are particularly important in a proceeding that seeks to penalize the landowner for a violation. See *Ciaffone v. Community Shopping Corp.*, 77 S.E.2d 817, 821 (Va. 1953) (a stricter construction of zoning ordinance is required in the case of prosecutions to enforce penal provisions of the ordinance). We should be particularly careful that the conduct found by the ELD falls within the clear prohibition of a permit condition before requiring the landowner to pay a large monetary penalty intended, in part, to deter such violations in the future.

We also must accord some deference to the conclusion of the ELD that a permit condition is vague. Such conclusions necessarily involve mixed questions of fact and law. See *Vitale*, 151 Vt. at 583, 563 A.2d at 615 (meaning of word "control" in Environmental Board rule is question of fact for Board). The division was created to place all environmental enforcement actions, and the appeal of certain environmental orders, before one judge. See 4 V.S.A. § 1001(b) (creating one environmental judge). Part of the purpose was to "provide for more even-handed enforcement of environmental laws." 10 V.S.A. § 8001(3). The Legislature expected that the environmental judge would develop expertise in environmental enforcement and ensure consistent interpretations of the law. She was using that expertise in this case.

A consultation of popular dictionaries points out the ambiguity in the word "sign." The Random House Unabridged Dictionary (2d ed. 1993) at 1778 has the broadest relevant definition of the word: "a notice, bearing a name, direction, warnings or advertisement, that is displayed or posted for public view." On the other hand, the American

Heritage Dictionary of the English Language (3d ed. 1992), at 1678 has a much narrower definition: "A displayed structure bearing lettering or symbols, used to identify or advertise a place of business." Definitions in other dictionaries fall in between. See Webster's College Dictionary 1245 (Random House ed. 1991) ("an inscribed board, placard or the like bearing an . . . advertisement . . . and displayed for public view"). The banners involved here appear to be signs for purposes of the Random House Unabridged Dictionary but not for purposes of the American Heritage Dictionary, because they lack a structure.

The American Heritage Dictionary use of the word "structure" goes exactly to the ambiguity. The word "sign" commonly refers not only to the message (advertisement) but also to the medium and connotes something more substantial and permanent than a banner. On this point, we should view the word in the context used in the permits. See *Veterans of Foreign Wars v. City of Steamboat Springs*, 575 P.2d 835, 839 (Colo. 1978) (construe meaning of sign to exclude free-standing picketing signs in light of requirement that the sign be "situated" on the premises). The permits refer to the "installation" of a sign. This word would not be used to describe the act of hanging or tieing a banner. It connotes that the sign is a "structure" as one dictionary defined it.

The Secretary argues from two other sources of law in support of her interpretation of the word "sign" as including the temporary banners hung on the restaurant by HFE. She points to case law, but a close reading of the appellate decisions she cites does not support her position.[1]

The second source of a definition is the Vermont statute regulating outdoor advertising, which provided at the time of this dispute:

§ 481. Definitions

As used in this chapter, the following terms are defined as follows:

. . . .

---

[1] She cited *State v. Gargiulo*, 246 A.2d 738, 741-42 (N.J. Super. Ct. App. Div. 1968). The case does involve enforcement of sign restrictions against a service station which was displaying a banner. However, the decision does not contain the ordinance definition of "sign," probably because the owner conceded the banner was a sign under the ordinance and the definition question here was not before the court. See *id.* at 741.

She also cited *Webb v. City of Raleigh*, 363 S.E.2d 681, 682 (N.C. Ct. App. 1988), but there is nothing in that very short decision that suggests that the court decided that a banner was a sign.

(6) A "sign" is any structure, display, device or representation which is designed or used to advertise or call attention to any thing, person, business, activity or place and is visible from any highway or other right-of-way. It does not include the flag, pennant or insignia of any nation, state or town.

10 V.S.A. § 481.[2] The Secretary argues that the banners should be held to be signs using this definition because they were used to call attention to a business and were visible from a highway. The definition is specifically limited to chapter 21 of Title 10, which does not include Act 250. The Secretary's argument reveals the problems connected with borrowing definitions from inapplicable statutes. The definition is tailored to the regulatory purpose involved and is more limited than any "plain meaning" or dictionary definition. The Secretary argues here that HFE's banners should be called signs because they were visible from the roadway, but is free in another case to argue that visibility from a roadway is not an element of a definition of a sign. Facing the risk of the imposition of a major penalty, the permit-holder cannot know what definition will ultimately be adopted.

The Secretary's reliance on the chapter 21 definition of "sign" shows how easy it is for the District Commission to provide an adequate definition of sign by referring to the statutory language. It could also have referenced a specific dictionary to resolve questions of interpretation. See *Route 4 Assocs. v. Town of Sherburne Planning Comm.*, 154 Vt. 461, 462, 578 A.2d 112, 113 (1990).

█ We conclude that the ELD's finding that conditions of the 9 and 9A permits did not prohibit temporary banners, in sufficiently specific terms, is supported by the record. Thus, the ELD was required to resolve the ambiguity in favor of HFE and TCA, and we affirm its decision doing so initially.

█ We cannot, however, affirm the ELD conclusion that a violation of permit conditions occurred on May 17, 1991 when the District Commission refused to approve hanging of banners after the District Coordinator ruled that the permit conditions applied to the banners. The ELD has authority to "determine whether a violation has

---

[2] Ironically, § 481(6) was amended in 1994 to state specifically that it included signs which are "temporary or permanent, portable or ground-mounted." 1993, No. 121 (Adj. Sess.), § 1. Apparently, the Legislature was concerned that something temporary would not be found to be a sign under the earlier definition.

occurred." 10 V.S.A. § 8012(b)(1). However, a violation is defined as "noncompliance with one or more of the statutes specified in section 8003 of this title, or any related rules, permits, assurances, or orders." 10 V.S.A. § 8002(9). Nothing in the language covers legal opinions of the District Coordinator or a Notice of Alleged Violation of the Commission, which in turn are valid only when supported by the statute or permit language. It was improper to assess any penalty for the second period, up until the 9B permit was issued with its specific language.

## II.

The parties appeal several conclusions made by the ELD regarding the calculation of penalties. These issues relate to penalties for the third period, as well as those for the second period, and thus remain live.

■ This Court will set aside the conclusions of the ELD only if they are not supported by the factual findings. See *Cameron v. Double A. Services, Inc.*, 156 Vt. 577, 581, 595 A.2d 259, 261-62 (1991). The ELD is authorized "to review and determine anew the amount of [any] penalty." 10 V.S.A. § 8012(b)(4). In so doing, it must consider eight factors, *id.* § 8010(b), but it is not required to impose separate penalty amounts under each one. See *Vermont Agency of Natural Resources v. Duranleau*, 159 Vt. 233, 239, 617 A.2d 143, 147 (1992).

■ The Secretary argues that the ELD's conclusion that the banners caused only a slight impact on the public health, safety, and welfare is unsupported by the findings, and that its findings on the aesthetic effect of the banners are clearly erroneous. See 10 V.S.A. § 8010(b)(1) (degree of actual or potential impact on public health, safety, welfare and environment resulting from violation shall be considered in determining penalty amount). The ELD found that the banners were visible from Routes 2 and 2A, and marginally visible from Interstate 89. The ELD also found that other area businesses had been using temporary banners during the time HFE's banners were displayed. Considering the appearance of the surrounding buildings and signs, the ELD determined that HFE's banners posed a negligible additional adverse aesthetic effect on the area. These findings are adequately supported by the evidence and are not clearly erroneous. The conclusion that the banners slightly impacted the public health, safety and welfare is supported in turn by the findings. The ELD's decision not to consider environmental impact in calculating the penalty is therefore sustainable.

Next, both the Secretary and HFE challenge the ELD's penalty calculation. In assessing the penalty, the ELD focused on the economic benefit of the violation to HFE and TCA, *id.* § 8010(b)(5), the deterrent effect of the penalty, *id.* § 8010(b)(6), and the presence of mitigating factors, *id.* § 8010(b)(2). The Secretary claims that the penalty was too small; HFE argues that there was no evidence of economic gain. Both parties contend that the penalty was arbitrary and without support in the record. We agree.

■ The ELD considered deterring future violations the primary reason for imposing the penalty. In calculating the penalty for unauthorized use of the banners, the ELD used percentages of the restaurant's gross receipts. The penalty for the banner violation was calculated for the period from October 9, 1991 through March 3, 1992 at 2 1/2% of the gross receipts. None of the findings support the use of this percentage, however, or demonstrate how the restaurant's gross receipts benefitted from the use of the banners. Cf. *Agency of Natural Resources v. Godnick*, 162 Vt. 588, 597, 652 A.2d 988, 994 (1994) (evidence showed that respondent's use of warehouse in violation of Act 250 conferred benefit of rental income and use of monies that should have been spent on complying with permit requirements). Because of the inadequate justification for the penalty imposed, we remand to the ELD for further consideration.

■ HFE also argues that the ELD had no basis under any of the eight factors to impose a penalty for HFE's failure to remove the interior light fixtures. The ELD assessed a penalty of $10 per day of violation, rounded to $300 per month for eleven months. In reaching this penalty amount, the ELD found that although HFE obtained no economic benefit from the violation and there was no evidence relating to the cost of removing the fixtures, HFE failed to explain or justify its eleven-month delay in removing them. In light of the deterrent purposes for which the ELD imposed the penalty, see 10 V.S.A. § 8010(b)(6), we are unable to say that the $10-per-day assessment was unreasonable. See *id.* § 8010(c) (if violation is continuing, penalty of not more than $10,000 per day may be assessed).

## III.

TCA appeals the ELD's assessment of penalties for both HFE and TCA as co-applicants without considering their individual circumstances. TCA argues that when imposing the penalty, the ELD should

have considered mitigating circumstances unique to TCA, such as TCA's attempt to persuade HFE to comply with the permits. The Secretary claims that to consider the co-applicants individually would weaken the permit's enforceability.

Co-permittees under Act 250 do not always share equal responsibility for permit violations. The § 8010(b) factors may well be different for each party, and that was indeed the case here, where economic benefits and mitigating circumstances clearly differed, thus necessitating individual treatment for each party. Further, 10 V.S.A § 8002 defines "[r]espondent" as "a person who has committed or is alleged to have committed a violation," *id.* § 8002(6), and "[p]erson" as "any individual, partnership, company, corporation . . . or any other legal or commercial entity," *id.* § 8002(4). Nothing in the statutes provides that co-applicants are to be treated as one person.

■ TCA and HFE as co-permittees are both responsible for complying with the permits and share fault for the violations. Nevertheless, by lumping them together in calculating the penalties, the ELD put HFE and TCA in an untenable position when it required them to allocate between themselves the responsibility for payment. The determination of individual liability is the responsibility of the ELD. See *id.* § 8012(b)(4). Thus, the ELD must analyze the circumstances of each party individually when assessing penalties for permit violations.

*The ELD's conclusion that the banners caused only slight environmental harm is affirmed; its imposition of penalties for violation of conditions of permits before October 9, 1991 is reversed; with respect to other violations, its order assessing penalties is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.*

**Gibson, J.,** dissenting. I concur in Part II of the Court's opinion, but I do not agree with Part I. Simply put, an advertising banner is a sign within the meaning of the 9 and 9A permits, and Handy Family Enterprises (HFE) violated the conditions of both permits when it installed the first banner in February 1991. I therefore respectfully dissent.

I agree with the Court that we must accord some deference to an Environmental Law Division (ELD) conclusion that a permit condition is vague. The ELD in this case, however, made no such conclusion. Here, the ELD concluded that Taft Corners Associates (TCA) and HFE had not violated their permits prior to May 17, 1991,

reasoning that the 9 and 9A permits did not specifically address temporary banners and that some area businesses had been using temporary banners without apparent challenge. It found, however, that, by May 16, when the District Commission denied the parties' request for approval of the banners, the parties knew the District Commission interpreted the 9A permit to prohibit the banners, and that banners placed or remaining on the building thereafter constituted violations of the 9A permit. I do not believe that these findings are tantamount to concluding that the 9 and 9A permits were vague or ambiguous. If that were the case, the ELD would not have found a violation of the 9A permit at all, regardless of the Notice of Alleged Violation.

Moreover, in her discussion of mitigating factors relevant to the penalty, the ELD stated that the terms of the 9 and 9A permits "*may have been*" too unclear to put HFE and TCA on notice that the temporary advertising banners were prohibited.[1] (Emphasis added.) The ELD's decision falls far short of concluding that the 9 and 9A permits were ambiguous or vague.

The 9 and 9A permits obligated HFE and TCA to maintain their project according to conditions contained in the permit. The 9 permit prohibited the installation of "*any* exterior signs" without written approval. (Emphasis added.) The 9A permit provided that "[t]he installation of exterior signs [is] limited to those approved," specifically, an egress sign and two awning signs, and required the parties to obtain written approval from the District Environmental Commission if they wished to change any of the conditions contained in the permit. The banners were not among the exterior signs approved by the District 4 Commission in the 9A permit. The permit emphasized its prohibition on additional signs in condition 8: "The installation of *any other signage* or change to that signage approved herein is strictly prohibited without the issuance of an amendment to this Land Use Permit or without the prior written approval of the District IV Environmental Commission." (Emphasis added.)

The 9 and 9A permits thus clearly stated that HFE and TCA needed written approval from the District Commission should they desire to install exterior signs different from those approved.

---

[1] The evidence relating to the existence of banners on other area businesses was offered and admitted for the purpose of establishing mitigating circumstances for the permittees' failure to comply with their permits. It was not offered or accepted by the ELD to demonstrate that the word "signs" in the 9 and 9A permits was ambiguous.

HFE argues that because the banners were temporary, they were not proscribed until the 9B permit was issued. The majority goes even further and finds that the word "sign" is ambiguous and connotes something with a structure that must be installed.[2] I am unaware of the rule of construction that permits a court to interpret a term based on the images the term conjures up in the minds of the court's members. I would examine the word "sign" according to the principle that words not specifically defined in a statute are to be given their plain and commonly accepted meaning. *Vincent v. Vermont State Retirement Bd.*, 148 Vt. 531, 535-36, 536 A.2d 925, 928 (1987). "Sign" is commonly defined as "a lettered board or *other display* used to identify or advertise a place of business." Webster's Ninth New Collegiate Dictionary 1096 (1991) (emphasis added). The common thread running through this definition and each of the definitions the majority cites is the requirement that the sign "advertise," provide "notice" or "identify" something. Under all the dictionary definitions in the majority opinion, a "structure" is not a sign unless it contains a "notice, bearing a name, direction, wording or advertisement," or bears letters or symbols "used to identify or advertise a place of business," or bears an "advertisement" and is "displayed for public view."

Further, I would view Act 250 in conjunction with the statutory scheme that regulates outdoor advertising generally, adopted two years prior to Act 250, see 10 V.S.A. §§ 481-506, because both acts serve the same purposes and policies. Compare 10 V.S.A. § 482 (legislative findings recognizing great value of Vermont's scenic resources and detrimental impact on those resources by outdoor advertising) and *id.* § 483 (prohibiting indiscriminate use of outdoor advertising promotes public health and welfare) with *id.*, chapter 151, Findings and Declaration of Intent (declaring it necessary to control land use to insure that such use will not be unduly detrimental to environment and will promote general welfare through orderly growth and development) and *id.* § 6086(a)(8) (before issuing land use permit, district commission must find that proposed use will not

---

[2] The majority also finds ambiguity in the permits because they refer to the "installation" of signs, a word the majority states "would not be used to describe the act of hanging or tieing a banner." The parties themselves, however, used this term to describe the very act for which the majority claims this word would not be used. For example, HFE wrote to the District Coordinator requesting "temporary approval of the non-permanent banners now *installed* at the Ponderosa." (Emphasis added.) In addition, in the stipulated facts submitted to the ELD, the parties listed the dates each banner had been "*installed*" on the restaurant.

adversely affect area's scenic or natural beauty and aesthetics). Section 481(6), as it existed at the time of the events herein, defined "sign" as "any structure, display, device or representation which is designed or used to advertise or call attention to any . . . business . . . and is visible from any highway."

In this case, the banners advertised that the building contained a restaurant that was open for business. The banners also advertised lunch and dinner specials, and were visible from Routes 2 and 2A. The banners, therefore, plainly came within the common meaning of the term "sign."

The fact that HFE did not intend to affix the advertising banners permanently to the restaurant does not alter the plain meaning of the word "signs" in the 9 and 9A permits. The permit applications did not request approval for "permanent" signs, nor were the 9 and 9A permits limited to apply to "permanent" signs only. Rather, the 9 permit stated clearly that the parties were not authorized to install *any* exterior signs without District Commission approval. Similarly, the 9A permit unambiguously stated that the parties could install only those signs approved in the permit, and that they needed permission from the District Commission to install *"any other signage."* (Emphasis added.) In light of HFE's continued use of the banners despite explicit warnings from the District Commission not to do so, it is not surprising that the 9B permit contained language expressly prohibiting temporary signs. That language does not, however, change the plain and unambiguous conditions set forth in the 9 and 9A permits that the parties must obtain approval from the District Commission before installing any unauthorized signs. In sum, nothing in the common meaning of the word "sign" or in the context of the 9 and 9A permits excludes a "sign" intended to be temporary.

To exclude temporary signs from the permit approval process would subvert the purposes of Act 250 and negate the Commission's ability to preserve an area's scenic or natural beauty under § 6086(a)(8). Both permanent and temporary signs have the capacity to affect an area's aesthetics adversely. In fact, the permittees needed approval to change the color of the two permitted awning signs. In approving the color change, the District Commission concluded that "the change in color from a burgundy maroon to a dark green . . . will reduce the overpowering appearance" of the signs, and it cited its efforts to preserve the area's scenic and natural beauty. I am unpersuaded that the temporary nature of the banners converted them from "signs" to unregulated displays.

Because I believe the banners violated the terms of the 9 and 9A permits, I respectfully dissent. I am authorized to say that Justice Johnson joins in this dissent.