2009 VT 16

## In re Eustance Act 250 Jurisdictional Opinion (#2-231) (Robert and Lourdes Eustance, Appellants)

[970 A.2d 1285]

No. 07-156

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 13, 2009

*Elizabeth A. Boepple* of *Witten, Woolmington, Campbell & Boepple, P.C.*, Manchester Center, for Appellants.

*David L. Grayck* of *Cheney, Brock & Saudek, P.C.*, Montpelier, for Appellees.

¶ 1. **Dooley, J.** Robert and Lourdes Eustance appeal an Environmental Court order that required an Act 250 permit amendment for the construction of improvements to their property. The Eustances argue that the improvements they constructed were for alpaca farming and thus are exempt from Act 250 review under 10 V.S.A. § 6001(3)(D)(i). We disagree that the farming exemption applies and affirm.

¶ 2. The following facts are not disputed. The Eustances own 47.64 acres on French Hollow Road in Bondville, Vermont. The French Hollow property, with a house on it, was purchased by the Eustances from James Ellis in 1999. Their land abuts that of Harold and Valerie Solomon, who in 1992 purchased their 40.05-acre parcel, with a vacation home on it, from Arthur Hurst. Ellis and Hurst were partners in a residential subdivision plan to include fourteen lots — including the lots later sold to the

Solomons and Eustances — on 162 acres.[1] In 1991, Ellis and Hurst applied for an Act 250 permit for the proposed subdivision.

¶ 3. In 1993, the District Environmental Commission granted the permit to allow the subdivision of five lots which had wastewater permits from the Vermont Agency of Natural Resources, construction of necessary roads and utilities for the permitted lots, and construction of certain common facilities on another part of the involved land. The permit did not provide for the subdivision to create the lots now owned by the Solomons and Eustances, although these lots were included in the permit application. Ellis and Hurst requested that the decision be modified to remove these lots from consideration in the permit proceeding, but the Commission refused, concluding that it had jurisdiction over the lots as part of the proposed subdivision and because of the length of the road to them.[2] The Commission added that "we regard the transfer of the 40.05 lot to Solomon prior to the issuance of this permit as a violation."

¶ 4. The Commission's permit decision stated that "[a]ny sale, further construction, or subdivision of the remaining eight lots compromising the balance of this 162-acre tract of land is specifically not approved without an amendment to this permit."[3] A series of conditions followed, several of which are relevant for the instant appeal. Condition one stated that "[n]o changes shall be made in the project without the written approval of the District Environmental Commission." Condition three added that "[b]y acceptance of the conditions of this permit without appeal, the permittees confirm and agree for themselves and all assigns and successors in interest that the conditions of this permit shall run with the land and the land uses herein permitted, and will be binding upon and enforceable against the permittees and all assigns and successors in interest." Condition twenty-five further

---

[1] The record before the Commission indicates that Ellis owned 82.55 acres of the land, including the land eventually conveyed to the Eustances.

[2] The petition also sought the deletion of findings related to the Solomon and Eustance lots, specifically the findings set forth in note 3, *infra*. The Commission did not make this deletion.

[3] The Commission's findings stated: "[W]e have inadequate information to determine whether disposal of sewage waste on these lots can be accommodated without creating undue water pollution. Therefore, these lots are specifically not approved. Conditions will be placed on the permit restricting any further development (including clearing and road construction) associated with these lots until an amendment application is approved."

stated that "[n]o further subdivision, alteration, or development of any parcels in this project shall be permitted without the written approval of the District Environmental Commission."

¶ 5. Responding to the Commission's conclusion that the subdivision that created the Solomons' lot was a violation of Act 250, the Solomons sought and obtained a permit amendment to authorize the subdivision and an addition to the house. Neither Ellis nor the Eustances sought a permit amendment when the Eustances purchased their subdivided lot.[4] Shortly after the purchase, the Eustances began improvements intended to serve an alpaca breeding operation, starting with the clearing of trees. They then constructed a barn, the westerly part of which is used as a veterinarian room for birthing and treating the alpacas. On the second floor of the westerly portion is a fiber studio, in which alpaca fiber is stored and sold. The easterly portion of the barn houses stalls for the female alpacas. Nearby, the Eustances added a manure bin, built in the form of a ten-by-ten-by-four foot concrete block. Down-slope, they constructed a secondary barn for the male alpacas, cleared land for fenced pastures, and added a second manure bin. The Eustances enclosed the property in wire fencing. Finally, they added a pond at the northern end of the property that caught any surface run-off to protect the wetlands that were further downhill. As completed, the alpaca operation occupies 9.9 acres,[5] and approximately 7.4 acres were cleared for the pasture, pond, and one of the barns.

¶ 6. The Eustances' operation currently houses fifty-three alpacas and five llamas, which are kept to protect the alpacas against predators. In addition to breeding alpacas and llamas, the operation stores and sells alpaca fiber and other products manufactured in the United States and South America, conducts animal husbandry seminars, and gives weekend tours of the property.

¶ 7. The land uses on the Eustances' property affect the Solomons' use of their property. A fifty-foot-wide right-of-way from French Hollow Road runs between the two properties. The Eustances' main driveway is 148 feet down the right-of-way, with the Solomon driveway another 270 feet beyond. However, the

[4] The District Coordinator rendered a jurisdictional opinion concluding that the sale of the land from Ellis to the Eustances was a violation of the 1993 permit. The Eustances have not disputed this conclusion.

[5] The parties dispute whether the alpaca operation affects more than the 9.9 acres mentioned.

Eustances built a second driveway directly across from the Solomons' to access one of the barns and the associated manure bins. The barn and manure bins are visible from the Solomons' house when the leaves are off the trees. The second driveway is used by farm vehicles and trucks, including trucks that remove manure twice per day. The Solomons claim that the manure bins regularly emit an odor that reaches their house.

¶ 8. On May 31, 2005, the Eustances filed an application with the District Environmental Commission to amend the 1993 revised permit, seeking approval of their subdivided lot and the alpaca operation on the property.[6] The Commission recessed the hearing in order for the Eustances to gather more information, and they tried to appeal at that time, arguing that the Commission had no jurisdiction over their development.[7] In order to properly bring the jurisdictional question to a head, the Solomons sought a jurisdictional opinion from the District Coordinator. The District Coordinator issued this opinion on December 23, 2005, holding that the Eustances' activities: (1) required amendment of the 1993 revised permit under the express terms of the document; (2) were subject to Act 250 jurisdiction; and (3) required an amendment of the revised permit insofar as the improvements and activities represented a material and substantial change.[8] In the jurisdictional ruling, the District Coordinator ruled that although farming is not development under Act 250, jurisdiction can attach to farming activity if the activity otherwise requires an amendment to an existing Act 250 permit.

¶ 9. The Eustances appealed this decision to the Environmental Court. Both parties moved for summary judgment as to whether

---

[6] The question of a need for a permit amendment was first raised by the District Coordinator in a letter to the Eustances in March 2002. The Eustances answered through counsel that the development was exempt from Act 250 review and that they wanted a binding jurisdictional ruling to that effect. For some reason, a binding jurisdictional ruling did not occur at that time, and the Eustances applied for a permit to cover the previous construction and operation of the alpaca farm.

[7] The Environmental Court dismissed the appeal because no final appealable order had issued. The motion to allow the appeal stated that the Eustances had agreed "that the existing permit created an ongoing but very narrower [sic] jurisdictional oversight," but believed that the Commission had gone beyond the narrow permissible review when it started to question some of their farming activities.

[8] Because the Eustances filed their application to the Commission before May 1, 2006, the effective date of the revised rules promulgated by the Natural Resources Board, the former version of the Environmental Board Rules governs this case.

Act 250 applied to the facts of the case. Joined by the Vermont Agency of Agriculture, the Eustances relied particularly on 10 V.S.A. § 6001(3)(D)(i), which states that farming on land below 2,500 feet in elevation is not development for purposes of Act 250. The Solomons made three arguments in response: (1) the permit governing the subdivision specifically required a permit amendment for further construction; (2) there is no exemption for farming where Act 250 jurisdiction is based on the presence of a subdivision; and (3) the project required an Act 250 permit as a material and/or substantial change to the permit.

¶ 10. On February 16, 2006, the Environmental Court granted summary judgment to the Solomons on the issue of Act 250 applicability. First, the court addressed the bearing of the revised 1993 permit on the facts of the case. Reasoning that the revised permit had not been appealed and was therefore final, the court concluded that, under the express terms of the permit, the Eustances were "required to seek further amendments . . . prior to their constructing any barns . . . or other related infrastructure."

¶ 11. The court turned next to the issue of whether there was a farming exemption for Act 250 amendment jurisdiction. The court began by surveying the Act 250 exemption set out in § 6001(3)(D), which states that development does not include, for the purposes of the statute, "construction of improvements for farming, logging or forestry purposes below the elevation of 2,500 feet." The court also mentioned that "the statute was amended in 2004 to clarify that, when development is proposed for a tract of land that is devoted to farming, only those portions of the land 'that support the development shall be subject to regulation under' Act 250, and permits 'shall not impose conditions on other portions' of the property," citing § 6001(3)(E). The court noted first that the issue of Act 250 jurisdiction over a parcel of land proposed for development is determined at the commencement of the project and thereafter runs with the land unless the permit has expired or the proposed activity is governed by an alternative statutory scheme giving another state agency exclusive jurisdiction to regulate it. Once Act 250 jurisdiction attached, the court reasoned, "Environmental Board Rule 34(A) requires a permit amendment to be obtained 'for any material or substantial change in a permitted project, or any administrative change in the terms or conditions of a land use permit.' " The court concluded that

once Act 250 jurisdiction has attached to a project, subsequent changes to a permit's terms or conditions, or material or substantial changes in a planned project, require a permit amendment. The court explained that such a conclusion vindicated the reasonable reliance of "neighboring landowners and prospective purchasers" on "the terms and conditions of a permit governing future activity on the property, or at least rely on their right to be heard in an amendment proceeding."

¶ 12. The court turned next to the Eustances' arguments about the farming exemption, stating:

> While the so-called farming exemption from Act 250 jurisdiction serves an important function in preserving individual farms and Vermont's strong farming tradition, it is not an unlimited exemption, especially in the context of land that has already received and been sold subject to an Act 250 permit binding successors in interest. Rather, other considerations come into play, including reliance on the terms of an issued Act 250 permit by other parties . . . .

> Moreover, the principles of land management embodied in the Act 250 criteria could not be implemented through the permitting program if subsequent exemptions could remove land from the ambit of an issued permit.

Accordingly, the court granted summary judgment to the Solomons on the issue of whether a permit amendment was required.[9] This appeal followed.

¶ 13. On appeal, the Eustances argue that the court erred in concluding that the farming exemption did not apply to Act 250 amendment jurisdiction. The Eustances further assert that an act passed by the Legislature in April 2007 controls the outcome of this case and dictates that Act 250 does not apply, even for permit amendments, when farming is at issue. We disagree and affirm.

¶ 14. This Court reviews summary judgment rulings de novo, applying the same standard as the trial court. *Washington v. Pierce*, 2005 VT 125, ¶ 17, 179 Vt. 318, 895 A.2d 173. Summary

---

[9] The court denied both cross-motions for summary judgment as to whether the Eustances' operation represented a material or substantial change in use. Thereafter, on March 16, 2007, the parties agreed to stipulate that the remaining issue was moot, and the court entered judgment accordingly.

judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." V.R.C.P. 56(c)(3). We also note that this is fundamentally a statutory construction case. "In construing a statute, we aim to implement the intent of the Legislature and will 'presume the Legislature intended the plain, ordinary meaning of the statute.'" In re Ambassador Ins. Co., 2008 VT 105, ¶ 18, 184 Vt. 408, 965 A.2d 486 (quoting Swett v. Haig's, Inc., 164 Vt. 1, 5, 663 A.2d 930, 932 (1995)).

¶ 15. We reach the same result as the Environmental Court for two primary reasons: (1) there is no farming exemption from subdivision jurisdiction; and (2) an explicit condition of the pre-existing permit requires approval of the Eustances' development.

¶ 16. First, we examine whether there is a farming exemption applicable to subdivision jurisdiction as the Eustances claim. Act 250 requires a permit in a number of instances. The operative statute is 10 V.S.A. § 6081(a), which provides: "No person shall sell or offer for sale any interest in any subdivision located in this state, or commence construction on a subdivision or development, or commence development without a permit." The District Coordinator and Environmental Court ruled that the Eustances needed a permit because Ellis sold the Eustances an interest in a subdivision and the Eustances commenced construction on a subdivision. The Eustances answer in part that jurisdiction cannot be created by construction of improvements if the facilities created are used for farming. In making this argument, they rely upon § 6001(3)(D), a part of the statutory definition of "development," which provides: "[t]he word 'development' does not include: (i) [t]he construction of improvements for farming."

¶ 17. The Eustances' argument is not an answer to the jurisdictional basis asserted in this case. If the District Coordinator had found jurisdiction based on the fact that the Eustances had commenced development as provided in § 6081(a), the exclusion of the construction of farming improvements from development would have answered the Coordinator's jurisdiction finding. But the exclusion of farming improvements from development is no answer to an assertion of jurisdiction based on the commencement of construction on a subdivision. Thus, the exclusion on

which they rely does not apply, and they have to obtain a permit for their construction. In reaching this conclusion, we are relying on the plain meaning of the language of the applicable statutory sections.[10] In response to the dissent, we add that if the Legislature intended a total exemption for farming from all Act 250 jurisdiction, it needed to say so.[11]

■ ¶ 18. We have a similar reaction to a second statute that the Eustances use to bolster their argument. In 2004, the Legislature added 10 V.S.A. § 6001(3)(E) to provide that when development is proposed to occur on land devoted to farming activity "only those portions of the parcel or the tract that support the development shall be subject to regulation under this chapter." 2003, No. 121 (Adj. Sess.), § 75. This language is a clarification of the exemption from "development" of land devoted to farming and, like the exemption language, is not applicable where jurisdiction is based on the presence of a subdivision. Moreover, it applies when land devoted to farming is subsequently developed for other purposes, a situation not applicable here. Again, based on the plain language of the statute, the amendment does not defeat Act 250 jurisdiction

---

[10] We reject the dissent's contention that the "gist" of this decision is that "whenever a parcel of land, regardless of its size . . . is subject to an overarching Act 250 permit, any commencement of construction for farming improvements on any part of that land requires another permit." *Post*, ¶ 29. This is a narrow decision involving a subdivision of land that resulted in Act 250 jurisdiction under 10 V.S.A. § 6081(a) because the Eustances commenced construction on the subdivision. It is based on the language of the statute which specifically provides alternative grounds for jurisdiction.

[11] Nothing in the expressions of intent contained in the dissent changes our view that the Legislature wrote a definition of "development" with respect to farming, rather than an exemption from all Act 250 regulation under all circumstances; indeed, none address the situation in this litigation. Moreover, there is a rational reason for the difference in a case like this. Vermont has adopted a right-to-farm law for the purpose of "protect[ing] reasonable agricultural activities conducted on the farm from nuisance lawsuits." 12 V.S.A. § 5751. The protection is available only if the agricultural activities are "established prior to surrounding nonagricultural activities." *Id.* § 5753(a)(1)(C). In this case, the agricultural activities were commenced within a preexisting residential subdivision, apparently with some conflicts over land uses. Just as the Legislature denied protection against nuisance suits to agricultural uses that are commenced after surrounding nonagricultural land uses are established, it could have concluded that commencing agricultural activities within a nonagricultural subdivision may require some regulatory control to reduce or eliminate conflicts.

here or strengthen the argument that this farming improvement is exempt from Act 250 subdivision review.

■ ■ ¶ 19. There is a second reason why the Eustances need a permit amendment that includes full review of their construction, as the Environmental Court and the District Coordinator ruled. As stated above, the amended Act 250 permit issued in May 1993 specifically stated that "[a]ny sale [or] further construction . . . is specifically not approved without an amendment to this permit." Under 10 V.S.A. § 6086(c), a District Commission may issue an Act 250 permit containing such "requirements and conditions as are allowable [under a] proper exercise of the police power" and consistent with the environmental impact criteria set forth in § 6086(a). In applying this section, we have long acknowledged the Board's power "to police its permits," to "revoke a permit if the conditions attached . . . are violated," and generally to exercise "continuing authority over . . . the uses and conditions imposed by the permit." *In re Juster Assocs.*, 136 Vt. 577, 580-81, 396 A.2d 1382, 1384 (1978). We have required that permit conditions be reasonable. *In re Denio*, 158 Vt. 230, 240, 608 A.2d 1166, 1172 (1992).

¶ 20. Subsequent applicants are bound by the terms and conditions of the original permit unless it is modified. *In re Stowe Club Highlands*, 166 Vt. 33, 37, 687 A.2d 102, 104-05 (1996). The permit in this case runs with the land and binds the "permittees, and all assigns and successors in interest."

¶ 21. There is no doubt that the permit condition in this case is reasonable. Additionally, as we have outlined above, it simply mirrors the requirements of the jurisdictional statute. Moreover, because Ellis failed to challenge the condition by appeal, he and his successors have waived any objection. See *In re St. Mary's Church Cell Tower*, 2006 VT 103, ¶ 8, 180 Vt. 638, 910 A.2d 925 (mem.).

¶ 22. The Eustances have not argued contrary to the Environmental Court conclusion that the express language of the permit condition required them to obtain a permit amendment irrespective of whether their construction activity would have been exempt as related to farming. There can be no argument against the conclusion that the sale to the Eustances, without a permit amendment, violated the permit condition. The Eustances have not challenged the court's conclusion that certain specified conditions

relating to matters like erosion control and dumping of waste into surface waters applied irrespective of their farming usage. We accept these conclusions as conceded. We also find that they are reasonable constructions of the permit which we would affirm even if there were no concession.

¶ 23. The dissent has attempted to create a disagreement by calling a "vague reference to 'further construction' " an insufficient ground to invoke jurisdiction over farming activity. *Post,* ¶ 39. We fail to see how the term "further construction" — a specific trigger in the permit — is vague, especially when applied to the construction of two barns and two manure bins. The Eustances clearly violated the requirement of the permit that they seek an amendment if they engaged in further construction.

¶ 24. Since we have affirmed on the two grounds discussed above, we need not reach the third ground, that amendment jurisdiction applies under former Environmental Board Rule 34(A) because the Eustances made a material or substantial change in the project. The court ruled that such jurisdiction could apply, but material facts were in dispute that prevented reaching a conclusion on summary judgment. The court's judgment read as follows:

> Appellants must apply for Act 250 approval of the as-built and any further proposed development on their property, both because the express terms of the Revised 1993 Act 250 Permit require it, and because the property is already subject to Act 250 jurisdiction, so that the so-called farming exemption does not divest it of jurisdiction. The parties agree that the appeal of the third ground for jurisdiction discussed in the jurisdictional opinion, whether the current status of Appellants' property constitutes a material or a substantial change under former Environmental Board Rule 34(A), is moot in light of this decision, concluding this appeal.

Although the parties have briefed this issue, and virtually all of the Eustances' argument is against the analysis of the court on this issue, it would be inappropriate for us to reach it because, as the lower court recognized, it is moot.

¶ 25. We also do not reach in detail another legislative amendment to Act 250 that the Eustances argue applies and requires that they prevail. Effective May 21, 2007, the Legislature added 10 V.S.A. § 6081(s), which provides that "[n]o permit amendment is

required for farming that: (A) will occur on primary agricultural soils preserved in accordance with section 6093 . . . or (B) will not conflict with any permit condition issued pursuant to this chapter." 2007, No. 38, § 15. All of the Eustances' construction activities came before the effective date of the amendment, as did the jurisdictional opinion of the District Coordinator and the decision of the Environmental Court.

¶ 26. The effectiveness of the amendment on pending litigation is governed by 1 V.S.A. § 214, which states in pertinent part that an amendment or repeal of a statutory provision shall not:

> Affect any suit, remedy or proceeding to enforce or give effect to any right, privilege, obligation or liability acquired, incurred or accrued under the amended or repealed provision prior to the effective date of the amendment or repeal; and the suit, remedy or proceeding may be instituted, prosecuted or continued as if the act or provision had not been repealed or amended.

*Id.* § 214(b)(4).

¶ 27. In this case, the Eustances' obligation to obtain a permit for its construction arose under the pre-amended language. As we explained in a comparable situation in *Sanz v. Douglas Collins Construction*, 2006 VT 102, ¶ 7, 180 Vt. 619, 910 A.2d 914 (mem.), the amended statute "can only be applied here if [it] . . . will not affect any right, privilege, obligation, or liability acquired prior to the statute's effective date." Because the amendment does not pass this test, we will not apply it to this case.

¶ 28. Although we have ruled based on the temporal applicability of the amendment, we note that it would not apply to this case in any event. By its relevant terms, the statute amendment applies to permit amendments only if the farming will not conflict with any permit condition. As we have affirmed the Environmental Court's determination that the Eustances' unpermitted construction activity violated an explicit condition of the 1993 permit, the amended provision would not apply.

*Affirmed.*

¶ 29. **Reiber, C.J.,** dissenting. The gist of the majority's decision is that whenever a parcel of land, regardless of its size or its history as agricultural or forested land, is subject to an

overarching Act 250 permit, any commencement of construction for farming improvements on any part of that land requires another permit, notwithstanding the Legislature's longstanding and explicit exemption from Act 250 for such activities. I do not agree, and therefore I dissent.

¶ 30. In this case, the subject parcel consisted of open or forested land suitable for farming at the time the sellers sought and obtained an Act 250 permit for a proposed residential subdivision. As the majority states, the Act 250 permit obtained by sellers authorized them to create five approximately five-acre subdivided lots within sellers' 162-acre parcel of land. Although the District Environmental Commission ruled that the entire parcel had to be included within the permit application, most of the specific permit conditions were directed at the five small subdivided lots being developed at the time. The permit included no provision relating to farming activities. The Eustances later purchased a forty-seven-acre parcel of land within the original 162 acres and commenced construction of improvements for an alpaca farm. Although the Eustances engaged exclusively in bona fide farming activities, and Act 250 exempts such activities from the permitting process, the majority upholds the Environmental Court's ruling that the Eustances were required to obtain an amended Act 250 permit for those activities.

¶ 31. This decision is a misapplication of Act 250. The statute was originally enacted to protect agricultural and forest lands from residential and commercial development, and thus has always included an explicit exemption from permit jurisdiction for farming and logging activities. See 10 V.S.A. § 6001(3)(D)(i) (excluding from definition of "development" any "construction of improvements for farming, logging or forestry purposes below the elevation of 2,500 feet"). As discussed below, the Legislature has steadfastly demonstrated its intent over the ensuing years, through amendments to Act 250 and other laws, to foster and protect Vermont agriculture, including the emerging emphasis on small, local farming operations such as the one involved in this case. The majority's decision is directly antithetical to this legislative intent.

¶ 32. The majority contends that its decision is mandated for two reasons. The first one is that "there is no farming exemption from subdivision jurisdiction." *Ante*, ¶ 15. According to the majority, the exemption applies only to original developments. The

majority seems to suggest that the Legislature has established a separate "subdivision jurisdiction" under Act 250 that is independent from "development jurisdiction." In my view, there is no formal dichotomy in Act 250 creating any such thing as "subdivision jurisdiction." Rather, the Legislature merely has set forth different situations in which an Act 250 permit is required: when a person or entity "sell[s] or offer[s] for sale any interest in any subdivision located in this state, or commence[s] construction on a subdivision or development, or commence[s] development." 10 V.S.A. § 6081(a).

¶ 33. The critical question raised by this appeal is whether the Eustances were required to obtain a permit to commence construction of improvements for farming on their parcel of land. The majority's view is that the Eustances were required to obtain an Act 250 permit amendment because their parcel was considered part of the permit application subject to the 1993 Act 250 permit subdividing the original 162-acre parcel, and thus they "commence[d] construction on a subdivision." *Id.* Hence, as noted, the majority construes § 6081(a) to mean that once an overarching Act 250 permit for the subdivision of property has been issued, even if the subdivided parcels consist of large tracts of open or forested lands, any subsequent agricultural activities on any of those lands requires an Act 250 permit.

¶ 34. But Act 250 treats farming differently, and does not command such a result. "The construction of improvements for farming" is not development subject to Act 250. *Id.* § 6001(3)(D)(i). Plainly, the Legislature intended Act 250 to protect farming operations, not only by requiring permits for residential or commercial developments that would replace farm lands, but also by insulating farming activities from the expense and litigation of the permitting process. There is no indication that the Legislature intended the permit requirement for commencing construction on a subdivision to trump this broad and explicit farming exemption. No language in the statute expressly states that the farming exemption is to be superseded any time lands are subject to an initial subdivision permit. The majority's construction effectively overturns the Legislature's express preference.

¶ 35. To the contrary, it appears that the Legislature intended a broad exemption from the permitting process for farming activities. We should construe the statute to implement this intent. See *Dep't of Corr. v. Human Rights Comm'n*, 2006 VT 134, ¶ 7,

181 Vt. 225, 917 A.2d 451 (stating that paramount goal is to effectuate intent of Legislature, and that legislative intent is effectuated by examining not only statutory language and any legislative history, but also legislative policies that statute was designed to implement); *Trickett v. Ochs*, 2003 VT 91, ¶ 22, 176 Vt. 89, 838 A.2d 66 (stating that primary purpose in interpreting statute is "to determine and implement the intent of the Legislature," which requires examining statute in its entirety, along with its purpose, effect, and consequences); *State v. Baldwin*, 140 Vt. 501, 511, 438 A.2d 1135, 1140 (1981) (noting that plain meaning of statutory language may be disregarded if it is contrary to legislative intent).

¶ 36. As the Legislature stated in its findings accompanying a recent amendment to Act 250, "Act 250 was enacted as a land use law in 1970 by a general assembly concerned about large scale, unregulated development in Vermont." 2007, No. 176 (Adj. Sess.), § 1a. "Revisions were made to Act 250 in 1973, . . . but the focus of the law remained to review large scale developments as those developments were defined." *Id.* Although Act 250 had broad purposes, "the Legislature in passing the Act did not purport to reach all land use changes within the state," or to impose upon them "the substantial administrative and financial burdens of the Act." *In re Agency of Admin.*, 141 Vt. 68, 76, 444 A.2d 1349, 1352 (1982). Specifically, because Act 250 was intended in large part to protect traditional agricultural and forest uses, from the beginning the law exempted farming and logging activities.

¶ 37. Over time, the Legislature has reiterated its intent to exempt farming activities from the Act. For example, effective in 2004, the Legislature added a provision to Act 250 stating that when a nonagricultural development occurs on land devoted to farming, "only those portions of the parcel or the tract that support the development shall be subject to regulation under this chapter." 2003, No. 121 (Adj. Sess.), § 75 (codified at 10 V.S.A. § 6001(3)(E)). Moreover, just recently, the Legislature added a provision restricting permit amendment jurisdiction for farming activities. 2007, No. 38, § 15 (codified at 10 V.S.A. § 6081(s)). In support of the Act containing this provision, the Legislature explicitly cited, among its goals, to "[s]upport programs and policies that foster the development of a diversified agricultural sector," and to "[e]nable agricultural operations of diverse sizes producing a wide array of products to prosper in Vermont and

contribute to the state and regional economy." 2007, No. 38, § 1. Finding, among other things, that "[f]arms are an integral part of Vermont's overall economy," and that "[t]he general public is increasingly interested in locally produced food," *id.* § 2, the Legislature stated that its intent, in part, was "[t]o support and develop a more robust and self-sustaining agricultural sector that also promotes emerging agricultural industries," and to "support and promote the Vermont agriculture industry as a vital component of the state's economy and essential steward of our land." *Id.* § 3.

¶ 38. In short, the message from the Legislature since the inception of Act 250 has been clear and unwavering — farming activities are exempt. For this reason, the Agency of Agriculture filed a memorandum of law with the Environmental Court in support of the Eustances' position in this case. For the same reason, I do not believe that the Legislature intended Act 250 to require a permit amendment for subdivided agricultural land based on the commencement of farming activities, certainly not when the subdivision permit did not require such an amendment.

¶ 39. This last point relates to the majority's second reason for requiring a permit amendment in this case — the 1993 permit purportedly requires it. In support of this position, the majority cites several conditions in the 1993 permit, none of which refers to farming activities. The principal permit condition cited is the following: "Any sale, further construction, or subdivision of the remaining eight lots comprising the balance of this 162 acre tract of land is specifically not approved without an amendment to this permit." The majority focuses on the term "further construction," insofar as the subject parcel has not been further subdivided since 1993. But vague reference to "further construction," which was part of a condition imposed in response to a residential development permit application, is insufficient to invoke jurisdiction over bona fide farming activities that are otherwise expressly excluded from Act 250's purview.

¶ 40. Although an Act 250 permit may impose conditions restricting otherwise exempted activities, see *In re Green Crow Corp.*, 2007 VT 137, ¶ 18, 183 Vt. 33, 944 A.2d 244 ("Act 250 may certainly impose permit conditions limiting tree-cutting activities associated with a subdivision"), such conditions must be explicitly directed at the normally exempted activity. Decisions of the former Environmental Board are consistent with this proposition.

For example, in one decision, the Board concluded that logging, an exempted activity, did not require an amended permit on land subdivided pursuant to a previous Act 250 permit because the previous permit did not have an explicit condition precluding or restricting tree-cutting or logging. See *In re Van Buskirk*, Declaratory Ruling No. 302, slip op. at 8-9 (Vt. Envtl. Bd. Aug. 15, 1995). In the same vein, a recent amendment to Act 250 requires permits to include statements indicating that farming is permitted on lands containing agricultural soils, unless the activity is in direct conflict with a permit condition. 2007 No. 38, § 15 (codified at 10 V.S.A. § 6081(s)(2)).

¶ 41. Here, the general permit condition cited above is far too vague, given the explicit statutory exemption for farming, to prohibit the commencement of construction for improvements related to farming. In construing permit conditions, we examine the ordinary meaning of words, but we "also keep in mind . . . that because land-use regulations are in derogation of property rights, any uncertainty in their meaning must be decided in favor of the property owner." *Agency of Natural Res. v. Weston*, 2003 VT 58, ¶ 16, 175 Vt. 573, 830 A.2d 92 (mem.); see *Sec'y, Vt. Agency of Natural Res. v. Handy Family Enters.*, 163 Vt. 476, 481-82, 660 A.2d 309, 312 (1995) (stating that any uncertainty in Act 250 land-use regulations must be construed favorably to property owner, and that permit conditions must be expressed with sufficient clarity to apprise property owner of limitations on land use). The phrase "further construction" does not explicitly prohibit otherwise exempted farming operations.

¶ 42. Nor do any of the other permit conditions cited by the majority preclude farming activities without a permit amendment. A condition stating that the District Environmental Commission must approve any changes to the project is also too vague, even assuming that the instant activities can be considered a change in the residential development project, to prevent an otherwise exempted activity. Another condition cited by the majority merely states that the successors and assigns of the permittees are subject to the permit conditions, which begs the question. Nor do I find applicable the last condition cited by the majority: "No further subdivision, alteration, or development of any parcels in this project shall be permitted without the written approval of the District Environmental Commission." The Eustances' farming activities are not a further "subdivision" or "alteration" of the

project, and their commencement of construction for improvements related to farming is not "development" under the law.

¶ 43. In the forty years since the enactment of Act 250, the Legislature has reiterated its intent to exempt farming activities from Act 250 purview. I believe that this broad exemption should apply in the circumstances of this case because neither the statute nor the specific conditions in the original permit invoke Act 250 jurisdiction. Accordingly, I would reverse the Environmental Court's decision that the Eustances are required to obtain an Act 250 permit for their farming operations.