STATE OF VERMONT

SUPERIOR COURT                    ENVIRONMENTAL DIVISION

| McCullough Crushing Inc. Amended CU | Docket No. 179-10-10 Vtec |
| --- | --- |
| McCullough Crushing Inc. Act 250 Exp. | Docket No. 3-1-10 Vtec |

## Decision on the Merits

In the pending coordinated matters, Applicant McCullough Crushing, Inc. (MCI or Applicant) seeks an Act 250 land use permit and municipal conditional use approval to expand its existing 45-acre gravel pit in Calais, Vermont both northerly into a wooded area and westerly into what is currently a large open agricultural field. These matters are longstanding.

MCI first applied for a conditional use permit in 2007. The Town of Calais Development Review Board (DRB) denied the application "without prejudice," citing inadequate supporting information, and MCI appealed. Certain neighbors—Alexander Meiklejohn, Douglas Meiklejohn, D. Stuart Meiklejohn,[1] Peter Brough, Jan Brough, and Flo Hartman (Neighbors)—cross-appealed this denial. The parties then stipulated to a remand to the Town of the appeal while MCI sought an Act 250 permit.

MCI applied for an Act 250 permit in March 2008, and the District #5 Environmental Commission (District Commission) granted the permit in December 2009, subject to a condition that MCI submit a plan to protect a "poor fen" (a type of wetland) on the site. MCI appealed that permit, challenging the fen-protection requirement and other conditions in the permit. The Neighbors cross-appealed the permit, seeking review under Act 250 Criteria 8, 8(A), 9(E), and 10.

While the Act 250 appeal was pending before the Court, the DRB considered the remanded application in 2010. The DRB again denied the application, citing concerns about the proposed destruction of the poor fen (MCI had not yet developed a fen protection plan, since it was appealing the Act 250 permit conditions), noise at neighboring properties (including a residential lot MCI had purchased from Lance and Bonnie Boardman), dust, and visibility of the

---

[1] Stuart Meiklejohn conveyed his property before trial, and withdrew as an Appellant.

1

pit. MCI appealed the Town's decision, seeking general review under the applicable standards, and also arguing that the DRB was not allowed to consider the Boardman parcel as part of its decision. The Neighbors cross-appealed, pressing the same points. James and Rebecca Davin appeared as interested parties in the conditional use appeal (they are not parties in the Act 250 appeal).

The parties jointly requested considerable time to resolve the several issues in the two appeals. The Town pursued purchasing the gravel pit, but was unsuccessful. The parties also completed mediation without resolving the disputes.

In October 2013, the Agency of Natural Resources (ANR) reclassified the poor fen on MCI's tract as a Class II wetland, which entitles the wetland to buffer-zone protection. MCI reached an agreement with ANR for a revised proposal that leaves the poor fen and buffer zone intact (developing the land surrounding the poor fen in two separate spurs). Finally, after considerable efforts, the parties were prepared for trial.

The trial was originally scheduled for winter of 2014. The Court conducted a site visit on October 22, 2014 in advance of trial to avoid any concerns of adverse weather and to allow the Court to view the gravel pit without snow cover. The parties then requested an additional continuance, which the Court granted. The Court held a four-day merits hearing from June 16 to 19, 2015 at the Vermont Superior Court, Civil Division, Washington County courthouse in Montpelier, Vermont. Appearing at the site visit were McCullough Crushing, Inc., represented by Attorney Christopher D. Roy; Neighbors, represented by Attorney David Grayck; James and Rebecca Davin, represented by Attorney L. Brooke Dingledine; and the Town, represented by Joseph S. McLean, Esq.[2]

Based upon the evidence presented at trial, which was put into context by the site visit, the Court renders the following findings of fact and conclusions of law.

<u>**FINDINGS OF FACT**</u>

I.      **Proposed Project**

1.   MCI currently operates a 45-acre gravel pit in Calais, Vermont (the existing operation).

---

[2] ANR, represented by Attorneys Jon Groveman and Elizabeth Lord, participated in pre-trial activities, but it did not participate in trial as the issues regarding the poor fen were resolved. Self-represented litigants Scott Gregory Grzankowski and Kevin Wells did not attend or participate in trial.

2. The existing operation is located on two parcels, together 53.9 acres. The southern parcel is a parcel MCI leases from William and Muriel Hudson. The northern parcel is owned by MCI. The southern area of the pit is generally referred to as the "Hudson pit" and the northern area the "McCullough pit."

3. Route 14 runs in a north-south direction to the east of the existing operation. Balentine Road is a town road that begins at Route 14 just to the south of the existing operation and runs in a westerly direction to the south of Hudson Pit area before turning to the northwest.

4. The existing operation is subject to two active Act 250 land use permits: Permit #5W0738 (for the Hudson pit) and Permit #520842 (for the McCullough pit). The existing operation also has two active Town permits, one for the Hudson pit and one for the McCullough pit.

5. The historic extraction rate for the existing operation is 110,000 cubic yards of sand and gravel per year.

6. MCI proposes an 11-acre expansion of the existing operation (the Project) into a 4-acre area that is part of the existing operation and into 7 acres of an adjoining 35.5-acre parcel (the Expansion Parcel).

7. The Expansion Parcel is located westerly of the existing operation and was formerly known as the Rathburn parcel. MCI currently owns the Expansion Parcel.

8. The Expansion Parcel currently has a hayfield, barn, house, and other small structures on it.

9. The Expansion Parcel is bordered by Balentine Road to the southwest and other parcels (not owned by MCI) to the west that are forested with some open fields and sparse residences.

10. Batten Road extends southwesterly from Balentine Road in the area of the hayfield on the Expansion Parcel.

11. A portion of the Expansion Parcel had previously been used for gravel extraction. This extraction took place 30 to 40 years ago in an area south of the poor fen. This area is now naturally reclaimed and has steep slopes.

12. A stream and wetlands are located along the western edge of the Expansion Parcel.

13. At least a 60-foot vegetative buffer will be maintained between pit operations and the limits of the stream and wetlands.

3

14. There is an isolated "poor fen" (a type of wetland) in the center of the Expansion Parcel. Through an agreement reached with the Agency of Natural Resources, MCI will maintain a fen-buffer that is adequate to protect the poor fen.

15. The northwest corner of the existing operation is a wooded area which has been designated as a deer wintering habitat by the Vermont Department of Fish and Wildlife.

16. MCI's Project, as proposed, will expand the existing operation in two distinct sections of the Expansion Parcel. One section will create a kind of prong or spur extending westward from the existing pit, south of the isolated poor fen into the hayfield (the Western Expansion area). The other section will expand the northwestern edge of the northern part of the pit (the Northwestern Expansion area).

17. The expansion has been designed to protect the isolated poor fen on the Expansion Parcel. The expansion activities will respect wetland buffers and the fen-buffer.

18. The existing gravel pit operations and the proposed Expansion Parcel are located in the rural residential zoning district as defined by the Land Use & Development Regulations for the Town of Calais (Regulations) (submitted as MCI's Ex. 9).

19. Material to be excavated is high quality gravel.

20. Currently, the Town imports gravel from another site over 40 miles away, and thus, the Town is interested in material from this local pit for its roads.

21. The expanded gravel pit operations will continue to use the crusher, field office, scale, gravel processing plant, and other existing infrastructure, and they will remain in their current location.

22. The expanded gravel pit operations will use the same access road that the existing operation uses: a road running west off Route 14, which also serves as road access for the Calais town garage. MCI does not own the access road.

23. The expanded gravel pit operations will be governed by the previously permitted maximum rate of material extraction: 110,000 cubic yards of material annually.

24. In recent years, the existing operation has not extracted close to the maximum annual rate because material is not available.

25. The volume of traffic to and from the Project will remain the same as the existing operation (40 to 50 trucks per day).

4

26. It is estimated that the Expansion Parcel has approximately 520,000 cubic yards of material suitable for extraction.[3]

27. Material washing at the project site has remained unchanged since the mid-1980's and will continue unchanged for the proposed expansion.

II.     **Procedural History**

28. MCI first applied for a conditional use permit from the DRB in February of 2007. In September of that year, the DRB denied the application "without prejudice." MCI appealed the denial to this Court. This Court stayed consideration of the appeal while MCI sought an Act 250 permit.

29. MCI applied for an Act 250 permit in March of 2008. The District Commission granted the permit in December of 2009, subject to certain redesign requirements imposed in order to protect the poor fen on the project site. Neighbors and MCI cross-appealed the decision to this Court.

30. MCI then asked this Court to stay the Act 250 appeal and remand the conditional use appeal back to the DRB so that the DRB could consider design amendments made during the Act 250 proceeding. MCI submitted its revised conditional use application in February of 2010.

31. In September of 2010, the DRB denied MCI's revised conditional use application, and MCI re-appealed to this Court.

32. MCI reached an agreement with the ANR regarding protection of the poor fen on the expansion site at some time after the second DRB denial.

33. In December of 2011, the parties participated in mediation. Mediation failed.

34. After filing the original municipal and Act 250 applications, MCI acquired a residential lot owned by Lance and Bonnie Boardman (Boardman parcel). The Boardman parcel is located south of the existing operation, and just south of Balentine Road and east of Batten Road.

35. MCI does not propose to use the Boardman parcel as part of the expanded operation.

III.    **Proposed Expansion and Reclamation**

36. As gravel extraction moves into the Expansion Parcel, land clearing and top soil removal must occur before gravel may be extracted.

---

[3] Due to the Court's condition further reducing the Western Expansion, this quantity will be reduced.

37. Top soil will be removed using an excavator and stockpiled. This soil will be placed over pit faces/walls when all material is removed and reclamation begins.

38. Removal of the trees and top soil may take approximately two to three weeks to complete and may not be completed all at once.

39. The finish grade of the pit (once extraction is complete) will be approximately 935 feet above sea level.

40. The finished slope of the pit walls will be approximately 1-on-1½ grade from the bottom of the pit to existing ground. Once extraction is complete and final slope and grade achieved, approximately two to four inches of soil will be spread on pit slopes and seeded with grass and mulched, and approximately three feet of loam sub-soils will be placed at the base of the pit and covered with six inches of topsoil and then seeded and mulched.

41. Softwood trees will be replanted at a rate of 600 to 800 trees per acre.

42. MCI will abide by the Re-Vegetation Plan approved by the Vermont Department of Fish and Wildlife for both the existing operation and the Expansion Parcel.

43. Reclamation costs at the time of project completion are estimated to be from $30,000 to $40,000. Project planning includes reclaiming areas as they are excavated. Thus, at the time of completion approximately 3 or 4 acres would require reclamation at a cost of approximately $10,000 per acre.

44. At present, approximately 95% of the existing operation has been sloped, seeded, and mulched. Some trees have been planted and more planting is planned.

45. Generally, MCI plans to reclaim the pit as it expands southward, but full reclamation depends on desirable material being completely extracted. As some pockets of desirable material remain, it is inefficient to temporarily reclaim, and then re-open the area, and then reclaim an area once again. Some areas will remain un-reclaimed until extraction is complete.

46. MCI has agreed to execute a surety agreement with the Town for the reclamation plans.

47. The area of the existing and proposed operations is generally described as woodlands, fields, an existing gravel quarry, and low density residential development.

48. To the east of the existing operation is State Route 14, running in a north/south direction, the Town garage, and low density residential properties.

49. To the north is the Kingsbury Branch and woodlands.

6

50. To the south is Balentine Road and the Boardman parcel.

51. To the southwest of the existing operation there are two residences, a barn, and an open hayfield (Rathburn field). Batten Road intersects with Balentine Road in the area where the field is located.

52. Further to the southwest is one residence off Batten Road and then woodlands. The Grzankowski residence is in this area.

53. The Meiklejohns' property, including their residence, lies to the west of the existing operation and the Northern Expansion area. The Northern Expansion area will bring the gravel extraction operations closer to their land. The area of Balentine and Batten Roads to the south and southwest of the existing operation is generally a quiet, rural, agricultural area and is markedly different than to the east were Route 14 is located.

54. Balentine Road is a narrow gravel road with predominantly local commuter traffic, and is routinely used for a variety recreational activities, including walking and bicycling.

55. On the western edge of the existing operation, a wooded ridgeline running generally north-south shields views of the existing operation from public roads to the south and west.

56. The wooded ridgeline forms the backdrop of the Rathburn field when viewed from the Balentine and Batten Road intersection and properties to the west.

57. There are trees along much of the northern side of Balentine Road. The Western Expansion does not propose removal of these trees.

58. There is a gap in the tree line along the northern side of Balentine Road in the area where Batten Road joins from the southwest. This area looks out into the Rathburn field.

## IV.    Impacts

59. The proposed Western Expansion will extend to the southwest beyond the ridge and tree line into the Rathburn field, eliminating most of the visual barrier provided by the existing mature trees along the ridge.

60. Once below grade, views of the day to day excavation activities in the proposed Western Expansion area will be partially screened by the pit walls.

61. The proposed Western Expansion area will be visible from Balentine and Batten Roads during early stages of clearing and excavation of the area, and as the operation moves onto the southwest face of the ridge, the operation will be, at least partially, continuously visible from the Balentine and Batten Road areas.

62. The proposed Western Expansion will also alter the visible topography from the Balentine and Batten Road areas due to the material that is expected to be removed.

63. The Western Expansion area will not be visible from Route 14.

64. Due to the elimination of the trees and lowering of the height of the land to the northeast of the Balentine and Batten Road area, portions of the existing operation will become visible.

65. The Northwestern Expansion area is surrounded on the western, northern and eastern sides by existing trees of a heavily wooded area. The Northwestern Expansion area will not be visible from Balentine Road. Limited views of this area may be possible while traveling north on Route 14.

66. Extraction in the Northwestern Expansion area will start in the northernmost area and migrate southward.

67. Extraction in the Western Expansion area will begin close to the existing operation and move southwesterly.

68. Views of the two expansion areas during the winter season will be minimized when snow covers the ground. Extraction does not occur during these months so snow cover will not be disturbed.

69. Applicant's noise expert modeled expected noise from the expanded operations in three different scenarios.

70. Scenario 1 modeled the existing baseline noise at the pit. Noise sources in this scenario were actually measured along Balentine Road and Route 14 (near the existing project driveway) and included noise generated from the operation of the crushing plant, generator, water pump, front-end loader, excavator, and a dump truck.

71. Scenario 2 modeled noise from the Northwestern Expansion area. Noise sources in this scenario included all the same noise sources as Scenario 1 (in the same locations) and added an excavator and loader in the Northwestern Expansion area.

72. Scenario 3 modeled noise from the Western Expansion area. Noise sources in this scenario were the same as Scenario 2, but the excavator and loader were moved to the Western Expansion area.

8

73. Predictive sound levels were calculated at 11 locations for each modeling scenario. These locations included the two actual sound measurement locations, nearby residences and points along the proposed project boundary.

74. Sound power levels were calculated using Lmax.

75. Predicted sound levels for Scenario 1, existing operations, ranged from 29 to 51 dBA Lmax.

76. Predicted sound levels for Scenario 2, the Northwestern Expansion area, ranged from 31 to 53 dBA Lmax.

77. Predicted sound levels for Scenario 3, the Western Expansion area, ranged from 30 to 53 dBA Lmax.

78. The noise model in both of the expansion scenarios resulted in sound levels at residences along Balentine or Batten Roads less than 55 decibels (dBA) Lmax and sound levels less than 70 dBA Lmax along the Project's property boundary.

79. Applicant's expert did not model noise with both the Northwestern and Western Expansion areas operating at the same time.

80. Applicant's expert explained that noise from the Western Expansion area will be more apparent during the initial development period when trees and topsoil are being removed. As this initial development work is complete and as gravel is extracted, the operating equipment moves to a lower elevation within the pit and noise will be less apparent.

81. Noise levels from excavation activities are reduced by physical barriers such as trees and natural or manmade earthen barriers.

82. The existing operation, and the proposed expansion, generate dust in three ways: trucks kick up dust on unpaved work roads; the bare faces of active pits can emit dust in dry conditions; and gravel and sand processing machinery emit dust during crushing and rock processing.

83. The Western Expansion area is expected to have minimal dust because the material to be extracted is clean and moist.

84. MCI uses a combination of water and chemical (calcium chloride) dust suppressants at its current operation.

85. MCI has a strong track record of responding quickly to dust complaints.

9

86. The crushing equipment at the existing pit (which will also be used for the pit expansion and will remain in its present location) is small enough that no air permit is required.

87. The proposed expansion does not propose to increase the previously permitted volume or rate of gravel extraction or introduce new processing machinery to the site.

88. Historically, the only dust complaints about the site related to the stockpiles of sand and gravel at the Calais town garage, which MCI does not control, and dust coming off the Route 14 access road, which MCI shares with the Town and which is not expected to be used more intensively as a result of the pit expansion. The access road will remain in its present location.

89. Stormwater and runoff is not discharged by the existing operation, but rather is collected within the pit and infiltrates into the ground. The proposed expansion will continue this practice.

90. Erosion is minimal because stormwater runoff drains into the pit. Permanent erosion control measures include stabilizing finished surfaces with topsoil, and then spreading seed and mulch.

91. The nearest domestic water supply well is located in the Wells' gravel well located on the east side of Route 14. All other water supplies are located on the opposite side of Kingsbury Branch north of the proposed and existing operations.

92. The expanded operations will continue to use an existing groundwater extraction pond for wash water and dust control water. Used wash water is stored in sedimentation basins and re-used. This use has been on-going for the past 26 years without any adverse impacts to surface or groundwater supplies.

93. The volume of groundwater that is used is less than one percent of the flow rate of the Kingsbury Branch.

94. The size of the Expansion Parcel has been reduced from what was originally proposed, bringing the southwestern edge of the operation away from Balentine Road and the neighboring properties.

95. As originally proposed, the Western Expansion area extended to approximately 150 feet from Balentine Road. As modified, the Western Expansion area is reduced in size and as currently proposed will be approximately 400 feet from Balentine Road.

10

96. MCI originally proposed to construct berms and landscaping to screen views of the Western Expansion area. As the expansion area is now reduced, the berms are no longer proposed.

97. MCI plans to reclaim the portions of the Western Expansion area visible from Balentine Road with grass and softwood trees.

## DISCUSSION

Because MCI's proposal has undergone significant revision since the DRB's and District Commission's decisions in 2007, 2009, and 2010, there is some dissonance in these appeals between the issues presented in the parties' initial statements of questions (filed in 2010 and 2011) and the issues actually disputed at trial.

During trial, MCI requested dismissal of its Act 250 Questions 1, 2, and 3, which relate to the poor fen, because the Project was modified to protect and preserve the poor fen. After discussion, no party opposed this request and the Court **GRANTED** dismissal, subject to the understanding that Neighbors could challenge the aesthetic effects of the Project on the fen under their Question 1 (which addresses the Project's compliance with Criterion 8). At trial, Neighbors requested dismissal of their Act 250 Question 2, relating to Criterion 8(A). As no party objected to dismissal the Court **GRANTED** the request. In their post-trial brief, Neighbors requested dismissal of their Question 6, which asked whether the application must be remanded to the District Commission. No party opposed this request in their responsive briefs, and the Court therefore **GRANTS** Neighbors' request and dismisses Question 6. The questions remaining in the Act 250 appeal are MCI's Questions 4–6, and Neighbors' Questions 1 and 3–5.

In the conditional use appeal, at the beginning of trial, Neighbors requested dismissal of their Conditional Use Question 4 regarding protection of surface water and wetlands.[4] The Davins opposed this request and the Court therefore **DENIED** dismissal. In their post-trial brief, Neighbors request withdrawal of their Conditional Use Questions 1–3.[5] See Neighbors' Proposed Findings of Fact, Conclusions of Law, and Order at 2, filed July 27, 2015. No party objected. The Court therefore **GRANTS** the motion to withdraw. The questions remaining in the conditional use appeal are MCI's Questions 1–9 and Neighbors' Questions 4–8.

---

[4] The question asked whether the conditional use application complies with Section 3.13 of the Regulations.
[5] These three questions ask: 1) Is remand to the DRB required? 2) Must the conditional use application be denied under the successive application doctrine? 3) Should the conditional use application be denied under law of the case doctrine?

11

The questions remaining before the Court center on three main issues: (1) whether the Court should consider the former Boardman parcel as part of the Project in its Act 250 and conditional use review (Neighbors' Act 250 Question 5, MCI's Conditional Use Question 8, and Neighbors' Conditional Use Questions 5–7); (2) whether the Project complies with Act 250 Criteria 8, 9(E), and 10 (MCI's Act 250 Questions 4–6 and Neighbors' Act 250 Questions 1, 3, and 4); and (3) whether the Project is entitled to conditional use approval under the Town of Calais Land Use Regulations (MCI's Conditional Use Questions 1–7 and 9 and Neighbors' Conditional Use Questions 4 and 8).

## I.     **The Boardman Parcel**

In several of the parties' questions, the parties raise the general issue of whether the Boardman parcel (a piece of land formerly owned by Lance and Bonnie Boardman and currently owned by MCI) should be treated as part of the proposed project.

### a.  *Whether the Boardman parcel is "involved land" under Act 250 (Neighbors' Act 250 Question 5)*

Neighbors' Act 250 Question 5 asks whether the Boardman parcel is "involved land" for purposes of Act 250 and, if so, whether it should be "encumbered as such" by any permit we might approve.

The phrase "involved land" is a term of art under Act 250.  See Act 250 Rules, Rule 2(C)(5).  "Involved land" is "the entire tract or tracts of land, within a radius of five miles, upon which the construction of improvements for commercial or industrial purposes will occur."  Id.  Rule 2(C)(5)(a).  Under the Act 250 Rules, only "involved land" counts towards a project's total acreage for the purposes of triggering Act 250 jurisdiction.  See 10 V.S.A. § 6001(3)(i), (v).[6]

Whether a certain parcel or portion of a parcel is "encumbered" by a permit is distinct from the issue of "involved land."  See In re Eastview at Middlebury, Inc., 2009 VT 98, ¶¶ 11–14, 187 Vt. 208.  While "involved land" is relevant to whether Act 250 jurisdiction is initially triggered, whether land is encumbered by a permit is really a matter of the scope of the "permitted project" under Rule 34(A).[7]  See id. (rejecting "involved land" framework).  If land is within the scope of a

---

[6] "Involved land" is also relevant in determining whether an application is complete, since the owners of involved land must sign an Act 250 permit application.  See Act 250 Rules, Rule 10(A).

[7] Several Environmental Board cases and decisions from this Court do appear to address this question using the "involved land" framework. See, e.g., In re Okemo Realty, Inc., No. 90033-2-EB, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. May 2, 1996); In re Lefgren Act 250 Permit, No. 28-02-07, slip op. at 7–8 (Vt. Envtl. Ct.

permitted project, it is "encumbered" by the permit, and any substantial/material changes to that land require an Act 250 permit amendment. See In re Stonybrook, No. 382, Findings of Fact, Conclusions of Law, and Order, at 17 (Vt. Envtl. Bd. May 18, 2001). If it is not, the land is not "encumbered" by the permit, and changes to the land only require an Act 250 permit if they independently trigger Act 250 jurisdiction. See id. Because there is no dispute that the Project at issue triggers Act 250 jurisdiction, we interpret Neighbor's question to ask whether the Boardman parcel is within the scope of the permitted project, and therefore encumbered by the Act 250 permit.[8]

The key case in determining the scope of a "permitted project" is In re Stonybrook, No. 382, Findings of Fact, Conclusions of Law, and Order, at 17 (Vt. Envtl. Bd. May 18, 2001). In Stonybrook, the Board announced a rule that the "permitted project" (i.e., the land subject to an Act 250 permit) is the "the tract of land, governed by the Land Use Permit, on which construction occurs, except in those instances in which the Permittee establishes that only a smaller portion of its tract has a nexus to, or is actually impacted or affected by, such construction." In re Stonybrook, No. 382, Findings of Fact, Conclusions of Law, and Order, at 17 (Vt. Envtl. Bd. May 18, 2001). The Board reasoned that the bright-line presumption in this rule would allow for clear, predictable results, while the exception would allow the rule to be "tempered by reason and reality." Id. at 17–18.

The Stonybrook case, though helpful in announcing a clear rule, does not clearly illustrate the requirement of a "nexus" between parts of a tract. In Stonybrook, a permittee appealed a jurisdictional opinion that a farmhouse on a 182-acre tract of land with an Act 250-permitted

---

Apr. 15, 2008); In re Bethel Mills, Inc., Jurisdictional Opinion #3-97, No. 243-11-05 Vtec, slip op. at 3 (Vt. Envtl. Ct. July 17, 2006). In In re Eastview at Middlebury, however, the Supreme Court clarified that "involved land" is relevant when there is a dispute over the triggering of Act 250 jurisdiction, but that Stonybrook governs the scope of a permitted project. 2009 VT 98, ¶¶ 12–14. This does not necessarily invalidate them as precedents, however, since the analysis in these cases is functionally similar to the analysis under Stonybrook. See, e.g., In re Bethel Mills, Inc., Jurisdictional Opinion #3-97, No. 243-11-05 Vtec, slip op. at 3 (Vt. Envtl. Ct. July 17, 2006) (essentially analyzing an adjacent parcel's functional relationship or "nexus" to a project parcel under "involved land" analysis).

[8] Whether land is "encumbered" by a permit might also refer to whether a particular parcel of land can be subjected to permit conditions. "Involved land" is not relevant to this issue either, however. See In re Green Crow Corp., 2007 VT 137, ¶¶ 7–9, 183 Vt. 33; see also In re Eastview at Middlebury, 2009 VT 98, ¶ 14. A Court may "encumber" land with permit conditions so long as those conditions are reasonable, and the Court's power to impose conditions is not territorially limited by the extent of "involved land." See In re Green Crow Corp., 2007 VT 137, ¶¶ 7–9; In re Eastview at Middlebury, 2009 VT 98, ¶ 14 (citing In re Eustance Act 250 Jurisdictional Opinion, 2009 VT 16, ¶ 19, 185 Vt. 447). We do not interpret Neighbors' questions to raise this issue because they do not suggest we attach any specific conditions to the Boardman parcel and because they appear to refer to In re Stonybrook in their post-trial briefing. See Neighbors' Proposed Findings of Fact, Conclusions of Law, and Order at 52, filed July 27, 2015.

13

condominium project on it was within the scope of the "permitted project." Id. at 1–2. The Environmental Board found that the permittee had failed to establish that only a subset of its 182-acre tract bore a nexus to the condominium association, pointing to the fact that the permittee had described the "gross project area" on its original application as 182 acres and that it had relied on that gross acreage to satisfy Criterion 9(B) and certain municipal density requirements. Id. at 17–18.

In a closer and therefore more helpful case, the Environmental Board elaborated on the relationship or "nexus" required under the Stonybrook test. See In re West River Acres, Inc., No. 2W1053-EB, Findings of Fact, Conclusions of Law, and Order at 8–10 (Vt. Envtl. Bd. July 16, 2004). In West River Acres, an applicant who owned several contiguous tracts sought to build an equestrian center on one 54.2-acre tract. Id. at 8–10. Though riders were allowed to ride onto surrounding tracts, the Board concluded that contiguous tracts were not within the scope of the permitted project because the environmental impacts from the project were minimal. Id. at 10. The lesson we take from West River Acres is that the impacts a project has on contiguous tracts is an important factor in the "nexus" requirement under Stonybrook.

Applying Stonybrook and West River Acres to this case, we begin by noting that the Stonybrook analysis applies equally to the scope of an original Act 250 permit and the scope of an Act 250 permit amendment.[9] In each case, Stonybrook addresses whether particular land is part of the proposed project, and subject to the permit that might issue. Though neither the expansion parcel nor the Boardman parcel were part of the original permit tract for the Hudson and McCullough pits, when MCI proposed to expand, the entire expansion "tract" is presumptively within the scope of any permit we might issue. We therefore begin with the presumption that the Boardman parcel is within the scope of the Project because it is physically

---

[9] Applicant suggests that Re: Okemo Realty, Inc., No. 90033-2-EB, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. May 2, 1996) and In re Lefgren Act 250 Permit, No. 28-02-07, slip op. at 7–8 (Vt. Envtl. Ct. Apr. 15, 2008) are controlling in the permit amendment context. See MCI's Proposed Decision on the Merits at 25, filed July 27, 2015. As characterized by Lefgren, Okemo Realty stands for the proposition that "adjacent, after acquired property need not automatically be deemed 'involved land' when an [sic] permit amendment is sought." In re Lefgren, No. 28-02-07 Vtec, slip op. at 8. As noted in footnote 8, these cases both use an "involved land" analysis to address the scope of the permit, which the Vermont Supreme Court rejected in In re Eastview at Middlebury, Inc., 2009 VT 98, ¶ 11–14, 187 Vt. 208. As also noted above, this does not necessarily invalidate these cases, but we choose not to rely on them explicitly in this case because: (1) as noted in Lefgren, the analysis in these cases is slim and (2) they do not necessarily contradict the rule in Stonybrook, because even under Stonybrook, adjacent, after-acquired parcels do not "automatically" become part of the permitted project if they lack a sufficient "nexus."

14

contiguous to the parcel of land MCI proposes to expand onto in this permit amendment application.[10]

The next issue, then, is whether the Boardman parcel has an insufficient nexus to the Project. There is some evidence that MCI purchased the property "to facilitate satisfaction of noise impact standards applicable to the Project." MCI's Proposed Decision on the Merits at 7, filed July 27, 2015. But MCI has also maintained that it will not use the parcel in association with the Project in any way, and the Project will not have any more severe impacts on the Boardman parcel than it will on other nearby properties. More importantly, given the conditions we ultimately impose on the Project, see *infra* Part II.a.ii, there will be little impact to the Boardman parcel from the Project, and this is a weighty factor under West River Acres, Inc., 2W1053-EB at 8–10. All of this suggests that there is an insufficient nexus between the Boardman parcel and the Project to bring the Boardman parcel within the scope of the project permitted in this Act 250 permit application. We therefore conclude that the Boardman parcel is not encumbered by the Act 250 permit we approve below.

> b. *Whether the Boardman property is owned or controlled by MCI and part of the application in the conditional use appeal (Neighbors' Conditional Use Questions 5, 6, and 7; Applicant's Conditional Use Question 8)*

Neighbors and MCI also raise issues regarding the Boardman parcel in the conditional use appeal. In their Questions 5 and 6, Neighbors essentially ask whether the Boardman parcel should be considered part of MCI's conditional use application, so that any permit we might issue would also apply to the Boardman parcel.[11] In Neighbors' Question 7 and MCI's Question 8, they

---

[10] Under Stonybrook, all land within the same "tract" is presumptively within the scope of the permit. The word "tract" as used in Stonybrook presumably carries the same meaning that it carries in other aspects of Act 250: "one or more physically contiguous parcels of land owned or controlled by the same person or persons." Act 250 Rules, Rule 2(C)(12); see also In re West River Acres, Inc., No. 2W1053-EB at 8–10 (treating contiguous parcels as a single "tract"). The Boardman parcel lies across a public highway from the expansion area. Under Vermont law, landowners are presumed to own land to the centerline of a public right of way, see In re Guy E Nido, Inc., No. 399, Findings of Fact, Conclusions of Law, and Order at 6 (Vt. Envtl. Bd. Jan. 17, 2002), and we have no evidence that there is any intervening ownership between the two parcels. Thus, the Boardman parcel and the expansion area are contiguous, and form one "tract" for the purposes of Stonybrook.

[11] In Neighbors' Conditional Use Question 5, they ask whether the application complies with requirements for conditional use applications in the Regulations "with respect to all land owned and controlled by MCI, including the property owned by Bonnie Boardman and Lance Boardman." In their Conditional Use Question 6, they ask whether the pit expansion application "includes the property formerly owned by Bonne Boardman and Lance Boardman as property owned or controlled by MCI and part of the application by MCI for conditional use approval."

ask whether we must take the Project's impacts on the Boardman parcel into account in our conditional use review.[12]

With regard to the first question—whether the Boardman parcel should be part of MCI's conditional use application, so that any permit we might issue would encumber the Boardman parcel—the only authority Neighbors have offered to support their position is Section 5.2 of the Regulations, which lists requirements for development review applications. Nothing in this section obligates applicants to list unrelated parcels in their applications, or would suggest that contiguous plots of land are automatically within the scope of an application. Furthermore, as we discussed above when analyzing a similar question with respect to Act 250, because the Boardman parcel does not bear a strong nexus to the Project parcel, it is outside the scope of the permitted project. We therefore conclude that the Boardman parcel is not part of the Project, and should not be encumbered by any conditional use permit we approve.

With regard to the second issue—whether we must take impacts to the Boardman parcel into account in our conditional use review—we conclude that we must because the Boardman parcel is a neighboring parcel that is not part of the proposed project, and MCI's ownership of the parcel does not affect this conclusion. We therefore consider impacts on the Boardman parcel in our conditional use analysis.

## II. **Act 250 Issues:**

Under Act 250, a project is entitled to land-use permits if the applicant can show that the development meets ten enumerated Act 250 criteria. See 10 V.S.A. §§ 6081(a) and 6086. The applicant bears the burden of production on all criteria, though the burden of persuasion shifts to opponents on Criteria 5 through 8. See 10 V.S.A. § 6088; In re Eastview at Middlebury, Inc., No. 256-11-06 Vtec, slip op. at 5 (Vt. Envtl. Ct. Feb. 15, 2008) (Durkin, J.).

The District Commission granted MCI's application. Neighbors appealed, raising broad challenges to the application under Act 250 Criteria 8, 9(E), and 10. MCI cross-appealed the decision to grant its permit application, challenging the scope of reclamation under Criteria 9(E)

---

[12] In their Conditional Use Question 7, Neighbors ask whether the Project must comply with certain standards in the Regulations "with respect to the property formerly owned by Bonnie Boardman and Lance Boardman as property owned or controlled by MCI and part of the application by MCI for conditional use approval?" MCI's Conditional Use Question 8 asks whether it is "appropriate to consider potential future impacts upon a separate, nearby parcel owned by [MCI] in evaluating whether there is an undue adverse impact on neighboring properties" under Section 4.4(C)(2)(a).

and the District Commission's condition requiring a permit amendment prior to permit expiration.

### a. Criterion 8

To receive an Act 250 land use permit, an applicant must provide evidence sufficient to enable the Court to find that the proposed project will not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites, or rare and irreplaceable natural areas. 10 V.S.A. § 6086(a)(8). If an applicant satisfies the initial burden of production, then the ultimate burden of proving that a project does not conform to Criterion 8 rests upon the project's opponents. 10 V.S.A. § 6088(b); In re Route 103 Quarry, No. 205-10-05 Vtec, slip op. at 8 (Vt. Envtl. Ct. Nov. 22, 2006) (Durkin, J.), aff'd, 2008 VT 88, 184 Vt. 283. The cornerstone of our analysis under Criterion 8 is the question: "[w]ill the proposed project be in harmony with its surroundings—will it 'fit' the context within which it will be located?" Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985). We received no evidence of historic sites, or rare or irreplaceable natural areas at the Project site or in the surrounding area. We therefore limit our review under Criterion 8 to the Project's impacts on aesthetics (including visual and noise impacts).[13]

A general analysis of aesthetic impacts can be subjective, and thus we follow the two-part test established by the former Environmental Board known as the "Quechee test" to evaluate a project under Criterion 8. Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 17 (quoting Re: Brattleboro Chalet Motor Lodge, Inc., No. 4C0581-EB, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. Oct. 17, 1984)); In re Rinkers, Inc., 2011 VT 78, ¶ 9, 190 Vt. 567 (approving use of the Quechee test). First, we examine whether a proposed project may cause an adverse impact on the character of the area. Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 19. If so, then we must determine whether that impact will be "undue." Id.

#### i. Character of the Area

When considering a project's aesthetic and noise impacts under Criterion 8, the baseline "character of the area" includes existing development in the area, and the sounds and noises historically emitted from existing development and other nearby uses and background noise.

---

[13] Much of Appellants' aesthetics evidence could be also be considered evidence supporting a claim that the area has scenic or natural beauty. In this matter we treat the analysis as one in the same.

Here, the area has two very distinct regions, each with a decidedly different character. One, including the existing operation and the land to its east, includes an operating gravel pit, the Town Garage, and Route 14—a highly traveled thoroughfare with significant truck traffic. Large trucks currently enter the existing pit from the east, along an entrance off Route 14. This existing access road will also serve the expanded operation. Within the existing operation is a rock crusher, field office, scale, and other pit infrastructure. This equipment will remain in its current location and be used by the proposed expansion. The existing operation is visible from Route 14 and noises from the extraction operation are common around and to the east of the existing pit.

The second area, distinguishable from the Route 14 and existing pit area, is to the west and south of the existing operation, generally referred to as the Balentine Road area. Balentine Road is a narrow gravel road, with limited vehicle traffic. Bicyclists and walkers often use the road for recreation and transport. Noise from the existing operation, while at times perceptible along Balentine Road, is significantly muted. The landscape of the Balentine Road area is dotted with fields and a few agricultural buildings and residences, with the remaining land covered in forest. Route 14 noise is negligible along Balentine Road and the existing operation is not visible from the Balentine Road area. In essence, the Balentine Road area provides the quintessential Vermont experience with a narrow country road, a few scattered residences, and surrounding farmland and woods. There was little evidence or testimony concerning impacts to the Route 14 area, thus it is primarily within the context of the area along and around Balentine Road that we consider whether the Project will cause an "undue adverse" impact on the character of the area.

*ii. Visual Impacts*

The Project is similar in scale, material, and operations to the existing operation. Current infrastructure will remain in place, but excavation and extraction equipment will move into the expansion area as the pit progresses, bringing machinery closer to the residences along Balentine Road. As proposed, the Project's visibility from public areas, including the Balentine Road area, will increase. Appellants, primarily focusing on the Western Expansion area, assert that the increased visibility of the Project and the alteration to the landscape that will result from the operation will result in an adverse impact to the rural character of the Balentine Road area. For the following reasons, we agree.

Currently, views from the Balentine Road area capture the rural and classic Vermont agricultural landscape. Exemplifying this landscape is the Rathburn field and wooded ridgeline

18

beyond. The field is visible for those travelling along Balentine Road, particularly in the area where Batten Road intersects with Balentine Road, and several residents in the area have views of the Rathburn field from their properties.

The proposed Western Expansion will decidedly alter the current visual landscape in the Balentine Road area.  The proposal is to extend the pit down into the Rathburn field, breaching the wooded ridgeline that provides a natural barrier between Balentine Road and the existing operation.  Even if the full extent of the operation will only be visible during the initial phase of excavation before the operation drops below grade, the gravel pit will certainly be apparent and the impacts to the landscape long-lasting.  We therefore conclude that the Western Expansion area of the Project is out of character with the area.  Further, because of its visibility from nearby residential properties and the Balentine Road area, and because a commercial gravel pit is not in character with the area, we conclude the Project will result in an adverse aesthetic impact.

Views of the Northwestern Expansion area, however, are limited and obscured by vegetation and dense forest.  The area is surrounded by trees on three sides.  Topography will also shield gravel pit operations in the Northwestern Expansion area.  Thus the impacts on aesthetics and any additional noise will be much less discernable in the Northwestern Expansion area and are not adverse.

Having concluded that the Project will result in an adverse aesthetic impact on the area's character, we must address whether the impact is undue and thereby prohibited by Criterion 8. 10 V.S.A. § 6086(a)(8). The Environmental Board noted that "the word 'adverse' means unfavorable, opposed, hostile" to the character of the area. Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 17.  The Environmental Board also established that an adverse impact would be considered "undue" if any one of the three following questions is answered in the affirmative: (1) Does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area? (2) Does the project offend the sensibilities of the average person? (3) Has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings? Id. at 19–20.

Based upon the evidence received at trial, we conclude that there is no clear written community standard intended to preserve the aesthetics of the Project area.  While the Regulations establish the broad goal of no undue aesthetic impacts, there are no clear aesthetic standards for the rural residential district and similarly the Town Plan only provides non-specific

19

aspirations. We therefore conclude that the Project does not violate any clear, written community standard.

Next, we consider whether the Project will offend the sensibilities of the average person and be shocking or offensive. While neighboring Appellants testified as to how they expect the Project to be offensive and how potential views from specific locations may shock them, we must consider the Project's impacts from the perspective of the average person. In re Goddard College Conditional Use, Nos. 175-12-11 Vtec and 173-12-12 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. Jan. 6, 2014). Under present-day conditions, there are no views of commercial gravel pit operations in the area, or any significant commercial or industrial activity in general. Hayfields, trees, and the rural Vermont landscape with a scattering of homes and farm buildings are all one encounters in the Balentine Road area. The Project, and specifically the Western Expansion portion, will result in a distinctive departure from the current character of the area, imposing on the land a foreign and deleterious use, and subjecting nearby residents to all the sights that come along with the such an operation. As a result, we conclude that the sensibilities of the average person would be offended or shocked by the addition of the Project.

Lastly, even with the steps MCI has taken to mitigate the impacts, the Project is not compatible with its surroundings. As originally proposed, the Western Expansion area reached much closer to Balentine Road. In an effort to address some of the Neighbors' concerns and decrease visibility of the Project, Applicant reduced the size of the Western Expansion, thereby increasing the distance between the Project and Balentine Road. MCI has resisted any further limitation on the Western Expansion area because of the value of the material in the area. We recognize that the material is valuable and that MCI has no control of where the gravel is located. Yet, we must respect Criterion 8 and the underlying issue in this matter—that the proposed gravel extraction will dramatically alter the character of the Balentine Road area. Again, although the proposed expansion continues the activities of the existing operation, even with the reduced scope, the Western Expansion pushes into an area that has historically been rural agricultural land, with a few residences, largely untouched by commercial and industrial activities. While this area is proximate to the existing operation, the ridge and wooded area create a distinct separation and mask the existing operation's presence. The proposed Western Expansion will eliminate this division and locate a visible and, as of yet, foreign industrial operation in the tranquil setting, resulting in an undue adverse impact on the character of the area.

20

In sum, we conclude that the Project's aesthetic impacts will be adverse, and also, that without further limitations, those adverse impacts will be "undue." The issue is the visibility and proximity of the Project to those using and living near Balentine Road. The existing operation is hidden from this area by a natural rise in the land and the forest that covers this rise. By preserving a portion of the forest, and limiting the Western Expansion so that it will not crest the height of the land, the majority of the impacts of the Project will be vastly curtailed and remain much like the impacts from the existing operation. To satisfy Criterion 8, we impose a condition limiting the Western Expansion area to the north and east of the ridge and tree line. We require that MCI maintain, at a minimum, a 30-foot setback from the height of land and/or the tree line, whichever limitation imposes a more north and easterly limit on the Western Expansion. With this limitation, unduly adverse views of the Project from the Balentine Road area and the surrounding residences and properties will be mitigated.

### iii. Noise Impacts

Noise impacts are also evaluated using the two-step Quechee test for "undue" adverse impacts on the character of the area. Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 19 (Vt. Envtl. Bd. Nov. 4, 1985).

We first consider whether the noise produced by the Project will have an "adverse impact" by reviewing "the nature of the Project's surroundings, the compatibility of the Project's design with those surroundings, and the locations from which the Project can be heard." In re Goddard College Conditional Use, Nos. 175-12-11 Vtec and 173-12-12 Vtec, slip op. at 15 (Vt. Super. Ct. Envtl. Div. Jan. 6, 2014). In other words, we ask whether the noise that will be produced by the Project is out of character with the existing sounds and noises of the setting. See id.

We use a benchmark known as the Barre Granite standard for measuring whether noise is adverse under the Quechee test: 70 decibels (dBA) (Lmax) at the property line of a project and 55 dBA (Lmax) outside an area of frequent human use. Re: Barre Granite Quarries, LLC, No. 7C1079 (Revised)-EB, Findings Fact, Conclusions of Law, and Order, at 80 (Vt. Envtl. Bd. Dec. 8, 2000); see also In re Application of Lathrop Ltd. P'ship, 2015 VT 49, ¶ 80. Even with the benchmark, the question of whether noise is "adverse" ultimately depends on whether the noise suits the existing soundscape, considering the nature and volume of existing noise and the qualitative character of the noise that will be added. In re McLean Enters. Corp., No. 2S1147-1-EB, Findings of Fact, Conclusions of Law, and Order, at 53–54 (Vt. Envtl. Bd. Nov. 24, 2004).

21

As detailed above, the region to the east is comprised of an existing gravel pit and Route 14, while the region to the south and west is mostly agricultural land, a few residential properties, and woods. Noise from truck traffic and the gravel extraction operation is currently prominent along Route 14 and in the existing pit area. Noise levels in these areas will not change significantly with the Project as the access road to the gravel pit will remain in the same location as will much of the rock crushing infrastructure. The greater concern is the proximity of extraction operations to the Balentine Road area. As we discussed in our analysis of aesthetics, the Western Expansion area is distinct from Route 14 and the location of the existing operation. The Project will not necessarily increase the intensity of the noise that has historically been generated from the existing operations, but it will move the source of the noise closer to the Balentine Road area, into an area that receives only minimal noises from the existing operation. With the proposed expansion, the noise will be much more proximate to Balentine Road and there will be no natural features to limit the noise impacts like those that exist for the current operation. Even though the area already includes some intermittent noise from existing quarry operations, and even though the proposed pit would not violate the Barre Granite standard, on the whole we conclude that adding more sporadic pit noise in closer proximity to surrounding residential properties would produce an adverse effect, given the peaceful and rural nature of the existing soundscape and the qualitative character of the sound that will be added. See John and Joyce Belter, No. 4C0643-6R-EB, Findings of Fact, Conclusions of Law, and Order, at 14 (Vt. Envtl. Bd. May 28, 1991) (concluding that drilling and blasting would be more than the neighborhood was used to on a regular basis, thus, the noise would have an adverse effect on aesthetics).

Finding the Project's noise impacts adverse, we conduct the second evaluative step by reviewing whether the adverse effect is undue. See Goddard College, Nos. 175-12-11 Vtec and 173-12-12 Vtec, slip op. at 16.

To determine whether an adverse effect is undue, the Court reviews the following factors:

1)      Does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area?
2)      Does the project offend the sensibilities of the average person? Is the project offensive or shocking because it is out of character with its surroundings or significantly diminishes the scenic qualities of the area?
3)      Has the Applicant failed to take generally available mitigating steps which a reasonable person would take to improve the harmony of the proposed project with its surroundings?

22

See Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 19–20.

The parties did not provide any evidence of the existence of community standards intended to preserve the aesthetics of the area. As opponents have the burden to show that a project does not conform to Criterion 8, we conclude that the Project does not violate any clear, written community standard.

We next consider whether the noise will be so out of character with its surroundings or so significantly diminish the scenic qualities of the area as to be offensive or shocking to the average person. Re: Pike Indus., Inc. and William E. Dailey, Inc., No. 1R0807-EB, Findings of Fact, Conclusions of Law, and Order, at 18–19 (Vt. Envtl. Bd. June 25, 1998). Residents in the area do hear some sporadic noise from the existing operation. Yet, as discussed above, moving the source of the noise closer to the Balentine Road area will produce an adverse effect. Neighbors offer that the impacts to the Balentine Road area will be undue due because of the tranquility of the area and distinctiveness of the sounds. We do not need to decide this question in this matter. As we found the aesthetic impacts of the Western Expansion would result in an undue adverse visual impact, we have conditioned the Project by limiting the Western Expansion—requiring that MCI maintain, at a minimum, a 30-foot buffer between the operation and the height of land and/or the tree line, whichever is more north and easterly. This limitation will also reduce noise impacts; the operation will be shielded by the topography and trees and other vegetation. The mitigation we impose will adequately mitigate noise impacts and improve the harmony of the Project with its surroundings. Therefore, as conditioned, the noise from the Project will not result in an undue adverse impact.[14]

Considering the aesthetic and noise evidence before the Court as a whole, including both an examination of the type and frequency of noise that the Project will generate and the neighboring land uses, we conclude that the Project, as conditioned by the Court, "fits" within this area. Thus, we conclude that the Project complies with Criterion 8.

---

[14] We note that MCI has taken steps to reduce the level or impact of noise from the proposed activities. The proposed Western Expansion area was first limited and pulled back away from Balentine Road by MCI to respond to the Neighbor's concerns – thereby reducing noise and aesthetics impacts. The condition we impose here, goes beyond what MCI has proposed, limiting the gravel operation to a distance farther from Balentine Road and more fully screened by topography and vegetation.

b. *Criterion 9(E)*

Neighbors broadly challenge the pit expansion's compliance with Criterion (9)(E) (Neighbors' Act 250 Question 3). MCI asks what reclamation plan should be required for the Project under Criterion 9(E) (McCullough's Act 250 Question 4) and challenges a requirement in its Act 250 permit that requires that it seek an amendment to its Act 250 permit "prior to the permit expiration date of December 31, 2030 so that the Commission may be assured of specific approved alternative use or development" (McCullough's Act 250 Question 5).

Act 250 Criterion 9(E) provides that a permit for earth extraction and processing will be granted if: (i) the extraction "will not have an unduly harmful impact upon the environment or surrounding land uses"; and (ii) the applicant proposes an adequate reclamation plan such that "the site will be left by the applicant in a condition suited for an approved alternative use or development" after the applicant's extraction operation is complete. 10 V.S.A. § 6086(a)(9)(E). The burden of proof under Criterion 9(E) is on the applicant. 10 V.S.A. § 6088(a); In re Route 103 Quarry (J.P. Carrara and Sons, Inc.), 2008 VT 88, ¶ 16, 184 Vt. 283.

The analysis under Criterion 9(E)(i)—whether there will be undue harm to the environment and surrounding land uses—is overlapping and related to the aesthetic analysis under Criterion 8, but goes beyond aesthetic impacts and includes interference with adjoining property owners' enjoyment of their land. See Re: John and Marion Gross, d/b/a John Gross Sand and Gravel Application., No. 5W1198-EB, Findings of Fact, Conclusions of Law, and Order, pt. IV, B (Vt. Envtl. Bd. Apr. 27, 1995); see also In re Rivers Dev. Act 250 Appeal, Nos. 68-3-07 & 7-1-05 Vtec, slip op. at 61 (Vt. Envtl. Ct. Mar. 25, 2010). Where adjoining property owners' use of their land pre-dates the proposed earth extraction operation, greater weight shall be given to their use and enjoyment of their land. See John Gross Sand and Gravel Application, No. 5W1198-EB, Findings of Fact, Conclusions of Law, and Order, at IV, B.

As we discussed in our analysis of Criterion 8, the proposed Western Expansion of the gravel pit operation will have an undue adverse impact on the aesthetic character of the area. Likewise, unmitigated, the Western Expansion will likely have an undue harmful impact on the environment and the neighbors use of their land. Use and enjoyment of the Balentine Road area stems in large part from its rural Vermont setting—fields bordered by woods, a few residences, and no observable commercial development. A visible gravel extraction operation, with its associated noise impacts, will certainly change the nature of the area and negatively impact the

24

enjoyment the adjoining property owners derive from use of their land. As further conditioned by the Court, however, views of the Western Expansion will be shielded from the Balentine Road area, and the Rathburn field will remain undisturbed. Additionally, preserving a vegetative buffer and maintaining the physical barrier provided by the ridgeline will minimize noise from the expanded operation. We therefore conclude that, as conditioned, the Project will not result in any unduly harmful impacts under Criterion 9(E)(i).

Criterion 9(E)(ii) requires us to assess the sufficiency of the proposed reclamation plan, and consider whether it is adequate so that "the site will be left by the applicant in a condition suited for an approved alternative use or development" after the applicant's extraction operation is complete. 10 V.S.A. § 6086(a)(9)(E)(ii). This provision does not require that the site look exactly as it did before the extraction operation took place, but rather that reclamation occurs and that the site will be stable and unlikely to suffer material erosion or other disturbances once quarry activities are completed and reclamation is accomplished. In re Rivers Dev. Conditional Use Appeal, Nos. 7-1-05 & 68-3-07 Vtec, slip op. at 65 (Vt. Envtl. Ct. Mar. 25, 2010). MCI's reclamation plan establishes that MCI will begin reclamation by first stockpiling topsoil when excavation is initiated. After extraction is complete, a final grade of the pit slopes will be 1-on-1½ sloping up to the height of the surrounding undisturbed land and woods. Once final grade is achieved, two to four inches of topsoil will be spread over the slope of the pit and the area will be seeded and mulched. Within the base of the pit, three feet of sub-soils will be deposited and covered with six inches of topsoil before seed and mulch is spread. The end result will be a grass slope and field. In areas where trees were removed, MCI will plant softwood trees to reforest the area, about 600-800 per acre. Based on the expansion limit condition we impose under Criterion 8, MCI will no longer need to reclaim areas of the Rathburn field, as no extraction will occur in that area. MCI will also follow a Deer Habitat Re-vegetation plan, approved by the Vermont Department of Fish and Wildlife, see MCI's Ex. 15, for the reforestation of the Northwestern Expansion area and northwestern portions of the Expansion Parcel to accommodate the deer wintering habitat in that area.[15] Lastly, MCI will post a surety of $40,000 that can only be released

___

[15] The Department of Fish and Wildlife appears to ask that we condition our approval on MCI following the reforestation plan. We need not make this an explicit condition. MCI has offered the reforestation plan as an exhibit and as evidence that Project impacts will not be adverse and that reclamation is adequate. As with MCI's other plans, MCI is bound to follow, as a condition of our approval, the plans it has offered as evidence of compliance with Act 250. The Department of Fish and Wildlife appears to have requested several additional conditions be made part of MCI's land use permit, in addition to those agreed to in the re-vegetation plan. MCI has made no offer that such

once reclamation is complete and approved by the Town. Based on these plans and conditions, we answer MCI's Question 4 and Neighbor's Act 250 Question 3 by concluding that the Project complies with Criterion 9(E)(i) and (ii). Compliance with Criterion 9(E) requires MCI to follow the plans as offered, including the conditions requested by the Department of Fish and Wildlife in MCI's Ex. 15.

Finally, through its Act 250 Question 5, MCI challenges the District Commission's requirement that "prior to the December 31, 2030 permit expiration date, an amendment application must be filed for review and approval of an alternative use or development of the site." It appears that the District Commission, through this condition, sought to ensure compliance with Criterion 9(E)(ii)—that the reclamation plan would render the land suitable for an alternative use or development. We need not reach the District Commission's power to impose such a condition, for we conclude that MCI's reclamation plan satisfies Criterion 9(E)(ii) without it.[16] Further, there is adequate assurance that MCI will complete the required reclamation for as our case law establishes, successful completion of a reclamation plan is a prerequisite before an earth extraction permit expires. See In re Hamm Mine Act 250 Jurisdiction, 2009 VT 88, ¶ 18, 186 Vt. 590; In re Roger Rowe et al Act 250 Gravel Pit, No. 96-7-12 Vtec, slip op. at 9 (Vt. Super. Ct. Envtl. Div. Jan. 19, 2016). Therefore, if MCI fails to adequately complete reclamation, jurisdiction will continue and the commensurate enforcement measures may be brought by the Natural Resources Board. We therefore answer MCI's Act 250 Question 5 by concluding that the District Commission's condition is not warranted and is not a condition of our Act 250 approval.

### c. Criterion 10

In their Act 250 Question 4, Neighbors ask whether the pit expansion will comply with Criterion 10 of Act 250. MCI argues that there is no mandatory language of the Town Plan that could constitute an enforceable provision prohibiting the proposed expansion, and therefore its proposal complies with Criterion 10.

---

conditions are inappropriate. To the extent it is unclear whether the conditions laid out in MCI's Ex. 15 are conditions of approval, they are. MCI must follow the re-vegetation plan and the Department of Fish and Wildlife's condition set out therein.

[16] Such a condition does appear to circumvent the specific legislative intent that Act 250 permits for mineral extraction be for a specific period of time. See 10 V.S.A. § 6090(b)(1).

Act 250 Criterion 10 requires developments to be "in conformance with a duly adopted local or regional plan." 10 V.S.A. § 6086(a)(10). In order for a town or regional plan's language to be binding on applicants under Criterion 10, the language in the plan must be mandatory, not merely aspirational. See In re Rivers Dev., LLC, Nos. 7-1-05 & 68-3-07 Vtec, slip op. at 9 (Vt. Envtl. Ct. Jan. 8, 2008) (Durkin, J.). Only language that sets forth a specific policy in clear and unqualified terms will create a mandatory standard cognizable under Criterion 10. In re John A. Russel Corp., 2003 VT 93, ¶ 16, 176 Vt. 520. Thus, noncompliance with "broad policy statements phrased as 'nonregulatory abstractions'" does not violate Criterion 10. Id. (quoting In re Molgano, 163 Vt. 25, 31–33 (1994)). In Russel, for instance, the Vermont Supreme Court held that an application for an asphalt plant in a town's rural area did not violate Criterion 10 where the town plan said the purpose of the rural district was to "preserve the rural character of the[] area" and prevent harm to "irreplaceable, unique, scarce resources and natural areas." Id. ¶ 18. There the Court reasoned that "[a]lthough the plan evinces a clear intent to protect the rural character of the area" there was no "specific policy prohibiting industrial development" and thus the proposed asphalt plant was not prohibited by the town plan. Id. ¶ 19.

Here, the Neighbors, although raising the issue of compliance with the Town Plan through their Act 250 Question 4, have not identified any provision of the Town Plan that establishes a mandatory standard or specific unqualified policy preventing the proposed gravel pit expansion. MCI offers that the Town and Regional plans only uses non-mandatory language in discussing earth extraction, and activities in the rural residential district in general, and thus Criterion 10 is satisfied. Based on our own review, we can find no mandatory provision prohibiting the Project. We therefore answer the Neighbor's Question 4 by concluding that the proposed expansion complies with Criterion 10.

III.   **Conditional Use Issues[17]**

Sand and gravel extraction operations are governed by the specific standards in Section 4.4 of the Regulations for earth extraction and the conditional use review standards under Section 5.3 of the Regulations. These two sections require that a project not have an undue adverse impact on neighboring properties; public facilities and services; drainage, surface, and

---

[17] Although the issues raised under Criterion 8 overlap significantly with issues raised under certain conditional use standards prohibiting "undue adverse impacts" to area resources, because issues under Criterion 8 and these conditional use standards are really the linchpin of this case, we address the issues separately for clarity sake.

groundwater; landscaping and screening; natural, cultural, historic, or scenic features in the vicinity of the operation; traffic on nearby roads; the use of renewable resources; and the character of the area.  See Regulations §§ 4.4(C)(2)(a)–(e); § 5.3(D).  Section 4.4 also requires that the operator of a proposed extraction operation post some form of financial guarantee with the town to ensure completion and reclamation of the proposed project.

### a. Character of the Area

MCI's Conditional Use Question 6 raises the issue of whether the expansion will result in an undue adverse impact on the character of the area under Section 5.3(D)(2) of the Regulations and 24 V.S.A. § 4414(3)(A)(ii).  Section 5.3(D)(2) provides that a project may not have an "undue adverse impact" on:

> Character of the neighborhood or area affected, as defined by the purpose or purposes of the zoning district within which the project is located, and specifically stated policies and standards of the municipal plan.  The Board shall consider the design, location, scale, and intensity of the proposed development in relation to the character of the adjoining and other properties likely to be affected by the proposed use.  Conditions may be imposed as appropriate to ensure that the proposed development is compatible with the character of the area or neighborhood, as determined from zoning district purpose statements, the municipal plan, and testimony from affected property owners.

24 V.S.A. § 4414(3)(A)(ii) requires that a conditional use not have an undue adverse impact on the character of the area as defined by the purpose of the zoning district and specifically stated policies in the town plan.  The Regulations provide the following purpose for the Rural Residential District (the district where the Project is located):

> [T]o provide for the development of residences and home businesses in ways that minimize impacts on open spaces, ridge lines, wetlands, wildlife habitat, prime woodland and agricultural soils, ecologically sensitive and scenic areas.

Regulations, tbl. 2.2(A). The Town Plan states, with reference to quarries and natural resource extraction, that:

> Sand and gravel deposits in Calais are glacial in origin and generally follow the courses of streams and rivers.  While these deposits may yield important and needed materials for road and building construction, Calais' coincidental development patterns render their extraction a matter of some sensitivity.  In addition, it is

28

important to note that care be taken in the siting and operation of development so that future extraction of resources is not foreclosed.

Town Plan at 31 (submitted as Ex. 10).

The parties dispute what comprises the "neighborhood or area affected." MCI offers that the area is not limited to Balentine Road, but also includes Route 14. The Neighbors offer that the area of Balentine Road should be considered separately from the area of Route 14. While the "character of the area" could be defined by the entire vicinity of the existing operation and the expansion areas, when, as here, there is a clear separation in the area, with two regions of very distinctive and disparate characters, there is nothing that prevents us from considering the impacts to these areas separately. Our analysis thus acknowledges that the Project's impacts will likely differ between the expansion area and the existing operation, and merely because the Project may not result in an undue adverse impact to the Route 14 region, does not control our conclusion as to the Project's impacts on the Balentine Road region and the surrounding residences.

Next, we note that the "undue adverse impact" language in this section of the Regulations mirrors the "undue adverse effect" language in Act 250 Criterion 8. In Question 7 of its Conditional Use Statement of Questions, MCI raises the issue of whether this Court can import the Quechee Lakes standard into the "undue adverse impact" requirement in the Regulations. After MCI's Statement of Questions was filed, the Vermont Supreme Court decided In re Group Five Investments, LLC, where it held that it was appropriate for this Court to use the Quechee Lakes standard as guidance in interpreting conditional use standards that require an undue adverse impact analysis. 2014 VT 14, ¶ 11, 195 Vt. 111. As MCI acknowledged in its post-trial brief, In re Group Five Investments allows this Court to use the Quechee Lakes standard in applying Section 4.4(C) of the Regulations. See MCI's Proposed Decision on the Merits at 8, filed July 27, 2015. We therefore answer MCI's Conditional Use Question 7 by concluding that we may use the Quechee Lakes standard as guidance when evaluating "undue adverse impacts" under Sections 4.4(C)(2) and 5.3(D)(2) of the Regulations, and we interpret the language of the Regulations to incorporate the well-established Quechee Lakes analysis.

As addressed in Part II.a of our discussion, Act 250 Criterion 8 generally covers the "aesthetics" of a project, and provides that no permit will be granted to a project that will have

29

an "undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). Following the two-step Quechee Lakes analysis, as we did in our Act 250 Criterion 8 analysis, we conclude that for the Route 14 region, noise, dust, and aesthetic impacts from the Project will have little discernable effect on existing conditions, and thus will not result in any undue adverse impacts. Pit noises are already audible in this region, truck traffic is frequent on Route 14, and there are views of the existing operation from Route 14. The proposed expansion will not alter the level of noise experienced in this region, nor will it increase the volume of truck traffic or exacerbate dust conditions, and views of the Project area from Route 14 will remain largely unchanged.

Unlike the Route 14 region, dust, excavation noise, and the sights of excavation equipment and the extraction process are foreign to the Balentine Road region. Thus, as we did under Criterion 8, we conclude that the Project will have an undue adverse impact on the Balentine Road region. The Project, as proposed, will not fit within the tranquil rural setting that currently exists along Balentine Road. But, with the condition we impose under Criterion 8, limiting the Western Expansion parcel to the north and east of the wooded ridgeline, we conclude that the undue adverse impacts will be ameliorated and the Project, as conditioned, complies with Section 5.3(D)(2) of the Regulations and 24 V.S.A. § 4414(3)(A)(ii).

### b.  Surface water and wetlands

Neighbors' Conditional Use Question 4 raises the issue of whether the conditional use application complies with Section 3.13 of the Regulations—Surface Water Protection.[18] MCI's Conditional Use Question 3 raises the question of whether the expansion causes an undue adverse impact on drainage or surface or groundwater supplies under Section 4.4(C)(2)(c)) of the Regulations.

Section 3.13 of the Regulations requires that a 50-foot vegetative buffer be maintained between any excavation or development and all lakes, ponds, named streams, and significant wetlands, and that a 20-foot vegetative buffer be maintained from all other streams and rivers. Section 4.4(C)(2)(c) prohibits undue adverse impacts on drainage or surface and groundwater supplies. Considering our findings of fact, especially findings numbered 12–14 and 89–93, and the agreement MCI reached with ANR to protect the poor fen, we conclude that the Project will

---

[18] We note that Neighbors sought to withdraw this question but the Davins objected and therefore the question remains for our review.

30

maintain adequate buffers to comply with Section 3.13 and that there will be no undue adverse impacts to drainage or surface and groundwater supplies.

### c. Dust

MCI's Conditional Use Question 2 raises the issue of whether the expansion will result in an undue adverse impact on neighboring properties due to dust under Section 4.4(C)(2)(a) of the Regulations. Considering our findings of fact, especially findings numbered 82–88, we conclude that the Project will not result in an undue adverse impact on neighboring properties due to dust.

### d. Noise

MCI's Conditional Use Question 1 raises the issue of whether the expansion will result in an undue adverse impact on neighboring properties due to noise under Section 4.4(C)(2)(a) of the Regulations. For the reasons set forth in our analysis of noise impacts under Act 250 Criterion 8, and with the condition we impose on the Western Expansion to alleviate the undue adverse aesthetic impacts of the Project, we conclude that the Project will not result in an undue adverse impact on neighboring properties due to noise.

### e. Landscaping and Screening

MCI's Conditional Use Question 4 raises the issue of whether the expansion will result in an undue adverse impact on neighboring properties due to landscaping and screening under Section 4.4(C)(2)(a) of the Regulations. The original application to expand the pit operations proposed a much larger extraction area located closer to Balentine Road. To mitigate the original proposal, MCI designed berms and plantings. As the extraction area was revised and reduced in size, the limits of the Western Expansion area moved more than 400 feet away from Balentine Road. Additionally, MCI agreed to leave the poor fen undisturbed and maintain a buffer for the poor fen. The proposed landscaping and screening was no longer necessary and it has been eliminated from the plans. As the Court further limits the Western Expansion area, thereby preserving the ridge and tree line on the Rathburn parcel, additional landscaping and screening is unnecessary as the expanded pit area will be largely invisible from view along Balentine Road. We therefore conclude that the expansion will not result in an undue adverse impact on landscaping and screening.

31

*f. Natural, Cultural, Historic or Scenic Features*

MCI's Conditional Use Question 5 raises the issue of whether the expansion will result in an undue adverse impact on natural, cultural, historic or scenic features under Section 4.4(C)(2)(a) of the Regulations.  During our trial, there was no offer of cultural or historic features in the area.  Issues presented were limited to impacts to the views and aesthetics of the Balentine Road region.  Based upon our discussion of aesthetics under Criterion 8, and the condition we impose on the Western Expansion area, we conclude that the expansion will not result in an undue adverse impact on natural, cultural, historic or scenic features.

*g. Reclamation Plan under Section 4.4(D)*

MCI's Conditional Use Question 9 and Neighbors' Conditional Use Question 8 ask whether the reclamation plan is adequate under Section 4.4(D) of the Regulations. MCI has represented that it is willing to post the financial surety with the Town.  The Town has asked that "a site reclamation plan, prepared by a landscape architect or other qualified individual, depicting, on a single document, the regrading, reseeding, reforestation and other site reclamation actions proposed for the site, should accompany any final Reclamation Escrow Agreement."  See Town of Calais' Response to the Parties' Post-Trial Filings and Proposed Conditions at 6, filed on Aug. 7, 2015.

Section 4.4(D) provides:

For sand or gravel excavation or soil removal, a performance bond, escrow account, or other form of surety acceptable to the Selectboard shall be required as a condition of approval to cover the cost of any regrading, reseeding, reforestation or other required site reclamation activity . . . .  However, upon the failure of the permit holder, their successors or assigns to complete site reclamation as required, the town may take legal action as appropriate to ensure site stabilization, reclamation, and cost recovery.

We read Section 4.4(D) to impose a financial surety requirement only.  It does not impose substantive standards for the adequacy of the reclamation.  Section 4.4(D) does not, therefore, give this Court authority to deny the conditional use permit on the basis of the content of MCI's reclamation plan.  We note that within our coordinated review of the Act 250 appeal, we considered reclamation issues pursuant to an evaluation of compliance with Act 250 Criterion 9(E).  While we conclude that Section 4.4(D) does not establish standards for reclamation plans,

32

we note that the Town's concerns are addressed as MCI must comply with its reclamation plan provided for compliance with Act 250 Criterion 9(E).

We do, however, condition our approval on MCI posting financial surety with the Town of Calais in an amount of $40,000.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the District Commission's granting MCI's Act 250 land use permit and **APPROVE** MCI's conditional use application, both subject to the following modifications:

a. We **STRIKE** the requirement imposed by the language on page 23 of the District Commission's Act 250 permit approval, which states: "In this context, and by permit condition, the applicant will be required to file an amendment application prior to the permit expiration date of December 31, 2030 so that the Commission may be assured of specific approved alternative use or development."

b. We impose the following two additional conditions on MCI's Act 250 and conditional use approvals:

1. MCI shall provide financial surety in the amount of $40,000 to the Town of Calais to ensure adequate reclamation.

2. The Western Expansion must preserve the existing tree line within the Rathburn field. MCI shall maintain, at a minimum, a 30-foot setback from the height of land and/or the tree line, whichever limitation imposes a more north and easterly limit on the Western Expansion.

A Judgment Order accompanies this Decision. This concludes the current proceedings before this Court.

Electronically signed on June 24, 2016 at 11:35 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Divisio